[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CONSOLIDATED DECISIONS
The above captioned matters are companion cases before the Court on appeal from decisions of the Zoning Board of Review for the City of Newport. Both cases have to do with the conversion of a well-known Newport hotel into a resort and spa. In furtherance of judicial economy and to promote clarity, this Court has consolidated these cases for purposes of rendering its decisions. The appeal in the matter of Jon. E. Cohen v. Duncan, et al.,
C.A. No. 2002-599 is addressed in Part I hereof. The appeal in the matter of Inn at Cliff Walk, Inc. v. Zoning Board ofReview of the City of Newport, C.A. No. 2001-380 is addressed in Part II hereof.
 General Background
Nicholas Inc. is the owner of real estate located in Newport at Memorial Boulevard, Tax Assessor's Plat 31, Lot 1, ("the property"). A hotel business, now known as The Chandler, operates on the property and is owned by The Inn at Cliff Walk, Inc. At one time, the hotel was known as the Cliff Walk Manor. The hotel first became operational in 1945 when its then-owner obtained approval for such use from the Newport Zoning Board of Review. Because the property was classified as a Residential C district under the zoning ordinance then in effect, zoning board approval was required for hotel use. See City Charter and Ordinances,City of Newport, Ch. 78-7(13) (1945 Revision) ("[h]otels, apartment and boarding houses permitted only when approved by the board of review, who shall determine in each individual application, the restrictions as to area, height, side yard, front yard, rear yard, and accessory uses"). In 1955, the ordinance underwent a revision, pursuant to which hotels would be allowed in Residential C districts only by special exception. Subsequently, in 1977, the ordinance was again amended. Pursuant to that amendment, the district in which the hotel was located was zoned as an R-20 district. In such districts, hotels were not permitted by special exception or otherwise. Finally, in 1994, the City of Newport reenacted and adopted Title 17 of the City of Newport Codified Ordinances, pursuant to the Zoning Enabling Act of 1991. The new zoning ordinance, ("Ordinance"), incorporated the R-20 zoning district in which the property was located and continued to prohibit hotels. See CODIFIED ORDINANCES OF THE CITY OF NEWPORT, RHODE ISLAND, tit. 17, § 17.28.020 (1994) [hereinafter Ordinance].
In early 2000, John Shufelt ("Shufelt") purchased the property and hotel business and did so with the intent of continuing the existing use and, in pursuit thereof, making superficial alterations and additions to the property. Although Shufelt and his companies ("Cliff Walk") originally planned to fix the hotel up and operate it largely the way it had been before, these plans quickly evolved into a new idea of transforming the hotel into a world class luxury hotel and spa. To this end, Cliff Walk determined to undertake substantial renovations, alterations, and additions to the hotel building and surrounding site. Cliff Walk's development plans included adding private balconies and walled entry courtyards to the building. The courtyard walls were to be 6 to 10 feet in height with doors allowing private ingress and egress for the newly renovated rooms. Cliff Walk's plans also included the addition of a swimming pool to the site and to a change of location of the existing parking lot from the front of the hotel to the southwest corner, which involved tearing up the asphalt currently in place and paving over the lawn area of the proposed site. Outdoor pavilions, patios, food staging areas, a large refrigeration unit with a courtyard kitchen, and a carriage house also were planned. And although Cliff Walk modified various aspects of its development plans as work on the project progressed, the core concepts for its multimillion dollar development plan were substantially solidified by September 1, 2000, when Cliff Walk applied for and received its first building permit.
Cliff Walk's development project faced neighborhood opposition and, as part of an attempt to avoid any challenge to the project, Cliff Walk's principal, John Shufelt, met with the hotel's neighbors to discuss Cliff Walk's ideas. (Jon E. Cohen, who resides at 12 Cliff Walk Terrace in Newport, is one such neighbor of the hotel property). Simultaneously, Cliff Walk set out on a fractionalized path to obtain administrative approval for its ambitious project. As disclosed by the record in theses cases, Cliff Walk sought piecemeal administrative approval for its project through an array of unorthodox devices — including requests for zoning certification, advisory opinions, unauthorized construction approvals, belated development plan approval, and protestations of detrimental reliance — the collection of which ultimately allowed the project, as a whole, to escape scrutiny under the terms of the Newport Zoning Ordinance governing the alteration of non-conforming development. Through the use of these devices, Cliff Walk was able to parse this considerable project into smaller components, the approvals for which it would then attempt to stack into an administrativefait accompli for the entire project.
In a pre-briefing conference with this Court, counsel for the parties agreed that Cliff Walk has substantially completed its renovations, alterations, and additions notwithstanding the pendency of these appeals.
 Standard of Review
The standard of review for this Court's appellate consideration of zoning board decisions is the same for each of these companion cases. When a zoning board decision is properly before this Court, the standard of review is articulated in R.I. Gen. Laws 1956 § 45-24-69(D), which states:
 "(D) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
 PART I — THE COHEN APPEAL
This appeal is before the Court as a consequence of an October 29, 2002 decision of the Newport Zoning Board of Review ("Board"). John E. Cohen ("Cohen") appeals the Board's approval of Cliff Walk's May 22, 2001 development site and planting plans. Cohen also appeals, inter alia, the Board's approval of certain authorizations — provided to Cliff Walk by a local building official — allowing exterior alterations to Cliff Walk's hotel, including a system of private balconies, stairs and walled courtyards that were added to the existing building.
 Facts/Travel
In this appeal, the parties agree that the hotel exists as a nonconforming use in the R-20 zone in which the property is classified under the City of Newport Zoning Ordinance ("Ordinance").[1] As previously indicated, Cliff Walk purchased the property in mid-2000 with the intent of continuing the nonconforming use and, in pursuit thereof, making superficial alterations and additions to the property. Although Cliff Walk originally planned "basically to fix [the hotel] up and operate it pretty much the way it has been before," (Testimony of John Shufelt, Tr. at 70 (Oct. 22, 2001)),[2] these plans quickly evolved into a new idea of transforming the hotel into a luxury world class small hotel. Id. at 75. After purchasing the hotel and operating it for a short time, Cliff Walk's principals began to conceive their plans for a multimillion-dollar renovation.Id. at 75-82.
In July 2000, Cliff Walk submitted architectural renderings to the Historic District Commission, the purpose of which was to obtain design approval[3] for certain exterior alterations. The renderings depicted the easterly and northerly sides of the hotel building. (Record, In Re: Zoning Bd. of Review Appeal ofJon E. Cohen, Respondent's Ex. 3 and 4).[4] Indicated as "new" were a flat roofed colonnade porch with a balustrade or railing and second floor balcony above, an extension of the balustrade or railing to a flat roofed addition, replacing a window with a door leading to the second floor balcony, a slate roof, wooden architectural columns and privacy lattice. On August 28, 2000, the Historic District Commission approved certain of the defendant's proposals, i.e. to change the window to a door on the easterly side of the hotel, to add a dormer on the westerly side of the hotel, to extend the flat roof and the colonnade on the northerly, easterly and southerly sides of the hotel, and to add the balcony on the east and north side of the flat roof extension. Although the renderings did show stairs leading to each of the rooms, they did not show the private balconies or fortress-like walled entry courtyards that were eventually constructed.[5] And, the very specific August 28, 2000 Historic District Commission written approval did not purport to authorize any first floor balconies, walls, or courtyards. The approval contained language directing Cliff Walk to obtain any necessary building permits from the building official's office. (Res. Ex. 5).
It was also in August 2000 that the defendant applied to the State of Rhode Island Coastal Resources Management Council for permission to create the private balconies at issue by extending the hotel's existing porch or deck 6 feet closer to the coastline. On August 21, 2000, as part of the CRMC process, the City of Newport building official, William Pasco ("Building Official") certified that he had reviewed Cliff Walk's plans dated August 2000 for a project titled "Cliff Walk — Alterations and Additions."[6] He also certified that the plans conformed to all elements of the zoning ordinance but that a building permit was required for the proposed alterations. (Res. Ex. 13). CRMC approval was forthcoming on August 23, 2000, and Cliff Walk was permitted to "extend existing balconies 6 feet (6') by means of cantilever, construct (2) new porches on north side of structure. . . ." (Res. Ex. 12). The CRMC approval did not purport to authorize the construction of the walled courtyard systems or stairs which were to extend far closer to the coastline than the proposed balconies.
Thereafter, on August 31, 2000, Cliff Walk submitted an application for the issuance of a building permit to the Building Official. The permit application described the work to be performed in this way: "relocate non-bearing partitions, remove ceilings, replace windows on [1st, 2nd, 3rd floors.]" Although the face of the application indicated there were no stamped prints involved, Cliff Walk submitted building plans to the building official. These technical plans (Res. Ex. 6A and 7) showed interior drawings including replacement windows and a new set of exterior entrance doors. The first floor detail for the east wing of the hotel (Res. Ex. 7) also showed shadowy, lightly shaded outlines of portions of the existing porch or deck extended by approximately 6 feet (6'), and two stairways that were vague in detail. It also showed some privacy screening on the north side of that wing. The plans did not reveal the systems of balconies, stairs, and walled entry courtyards that were eventually added to the hotel building, and Cliff Walk did not apply for development plan review[7] for its proposed alterations. The total cost of the proposed construction, as indicated on the permit application, was estimated at $500,000.00. The next day, on September 1, 2000, the Building Official issued a permit that allowed Cliff Walk to "relocate non-bearing partitions, remove ceilings and replace windows on 1st, 2nd, 3rd floors. Install exterior door, per plan[.]" Although the permit language was plainly limited, Cliff Walk did not appeal the Building Official's decision to issue the permit using that language. Shortly after the permit was issued, Cliff Walk commenced a development and construction project, the first phases of which are now complete, and which, by all accounts, involved extensive renovation of the property and some $6-7 millions in work.
Despite the language of the September 1, 2000 permit, Cliff Walk's construction activities were "much more extensive than what it says on the permit." (Testimony of John Shufelt, Tr. at 103-104 (Oct. 22, 2001)). Cliff Walk not only commenced "gutting the building," but also made "all kinds of architectural changeson the outside of the building with regard to the columns,reconfiguring the decks, [and] building the courtyards. . ."Id. (Emphasis added.) It also commenced replacing almost everything including the electrical, plumbing, HVAC, sprinkling,[8] and even the walls and floors, and making the guest rooms luxurious, with fireplaces in each room, larger bathrooms with big marble/tile showers, and many other luxury amenities. Id. at 78-79, 104, 127.
During the construction process, on October 17, 2000, Cliff Walk provided modified first floor building plans to the Building Official. (Res. Ex. 10 11). The first page of the plans (Res. Ex. 10) was an interior plan for the main building only, showing the technical changes to the first floor, namely, a staircase, a proposed office, and reconfigured men's and ladies' restroom. The second page of the plans (Res. Ex. 11) depicted the east wing of the building. This plan showed, in more detail than the plan submitted with the application for the building permit, the existing colonnade or deck, reconfigured and enlarged to extend outward approximately 6 feet (6") to form a system of four balconies, and four sets of stairs leading from the balconies to enclosed areas below. The outlines of the system were no longer lightly shaded as they had been in the earlier plans but were, instead, darker and in the same tone as the rest of the drawing. The plan did not include technical specifications for the system such as the width of the stairs, the nature or height of the enclosure walls, etc. The plan did not depict any additions to the northerly side of the building. Cliff Walk neither applied for development plan review of its anticipated additions to the site nor made an application for a building permit to construct the changes shown in the plans, and no new or amended permit was issued. Neither the Building Official nor the local zoning officer stamped or otherwise marked the building plan as "approved."
Then, on October 26, 2000, Cliff Walk's attorney[9] sent three[10] letters to Guy Weston, Zoning Officer for the City of Newport ("Zoning Officer"), in an attempt to obtain administrative approval of various other aspects of its development project. One of the letters, dated October 26, 2000, bore the caption "RE: Request for Zoning Certificate-Parking Area." In that letter, Cliff Walk, purportedly pursuant to G.L. §45-24-54 and Ordinance § 17.112.010, requested a zoning certificate containing a statement or opinion that a proposed plan to relocate an existing parking lot to another area on the property would be permissible. Another letter, bearing the caption "RE: Request for Zoning Certificate — Refrigeration Unit," similarly requested approval to make a 14'×18' addition to the hotel in the form of a refrigeration unit. The proposed location was the northerly side of the hotel — approximately the same location where Cliff Walk would later construct some of the walled entry courtyards at issue in this case. Neither letter purported to request development plan review.
On October 31, 2000, the Zoning Officer informed Cliff Walk that the City of Newport viewed the hotel property to be a nonconformance and that Cliff Walk's proposal to build the proposed 14' × 18' addition to the hotel was "strictly forbidden." Zoning Certificate, Guy Weston, Zoning Officer, City of Newport, to Turner C. Scott (Oct. 31, 2000). Cliff Walk subsequently claimed an "appeal" from this information, but later withdrew that "appeal" in late December 2000.
On November 22, 2000, Cliff Walk provided the Zoning Officer with a follow-up letter bearing the caption "RE: Tax Assessor's Plat 31, Lot1; Request for Zoning Certificate — Parking area; Request for Zoning Certificate — Use of common area." The letter referenced a plan prepared by a landscape architect. That plan showed a detailed layout for 50 parking spaces. Full sized spaces, spaces for compact cars, and handicapped parking spaces were all clearly designated. (Res. Ex. 1). The plan also showed proposed additions to the site in the form of a permanent patio, outdoor bathrooms, and a food service staging area — the proposal of which Cliff Walk eventually would abandon. The plan also depicted, on the north side of the hotel building, the outline of courtyards and the 14' × 18' refrigeration unit that Cliff Walk, at that time, was still proposing to build. Finally, the plan showed the outline of proposed changes to the easterly side of the hotel structure, i.e. the porch or colonnade reconfigured and extended to form four private balconies with steps leading to enclosed private entry courtyards and a surrounding outer wall. In the letter, Cliff Walk reiterated its intention to add a swimming pool to the premises notwithstanding that it was not shown on the plan. Cliff Walk did not request development plan review, and the City undertook none.
The Zoning Officer responded to Cliff Walk's inquiry concerning the parking area on December 8, 2000, by issuing a "zoning certificate." Although the Zoning Officer's certificate stated that the proposed layout of the parking spaces was permitted under the zoning ordinance, it also stated that the proposed off-street parking changes must be reviewed as a development plan. Notwithstanding the non-binding nature of a zoning certificate,[11] and despite the fact that Cliff Walk had applied neither for development plan review nor CRMC approval to relocate the parking lot, the Zoning Officer undertook to record this certificate in the land evidence records for the City of Newport.
Thereafter, in March 2001, Cliff Walk provided yet another set of building plans (Res. Ex. 19A and B)[12] to the Building Official. These building plans showed slightly more technical detail than the October 2000 plans, depicting minor interior changes and a reduction in the number of private balconies and staircases from four to three. The plans also depicted the vague outline of some form of addition to the north side of the building in the area where Cliff Walk had previously sought to add the 14' × 18' refrigeration unit. Cliff Walk did not make an application for an additional permit, and no new or amended permits were issued. Neither the Building Official nor the Zoning Officer stamped or otherwise marked the building plans as "approved."
On May 22, 2001, approximately eight months after it began construction, Cliff Walk belatedly submitted a request for development plan review to the Zoning Officer. With it, Cliff Walk submitted a two page set of plans entitled "Development Site Plan" and "Development Planting Plan," both of which were dated May 22, 2001. (Res. Ex. 15A and 15B). These plans were different from the Proposed Landscaping and Parking Plan submitted to the Zoning Officer for the purpose of garnering the zoning certificate. The new plans showed a reconfigured front entrance, a relocated driveway and, on the easterly side of the building, the plans showed four private balconies extending from the original colonnade or porch, three of which were replete with stairs that afforded private ingress and egress to the individual rooms, and all of which were surrounded by a garden wall and courtyards, more stairs, and a gate for general pedestrian access and egress to that courtyard. The plan also showed four walled courtyard additions on the north side of the building, all of which were depicted as encroaching into the yard setbacks. The plan did not depict all of Cliff Walk's anticipated improvements, such as the swimming pool.
On May 25, 2001,[13] the Zoning Officer wrote a letter to Cliff Walk purporting to approve its Development Site Plan subject to certain provisos having to do with signage, landscaping, and the like. The Zoning Officer also stamped the Development Site Plan and Development Planting Plan as "approved," dated them, and initialed them.
On June 4, 2001, Cohen responded by writing the Board a letter in which he claimed an appeal to the Board from:
 "(a) the granting of Development Plan Review Approval for changes to the Property; (b) from any and all permits or other approvals permitting any expansions of or changes in the use of the Property; and (c) the failure to obtain proper permits for all changes to the Property, including, but not limited to, the following:
 • approval of an outdoor pool in the northeast corner of the Property,
 • the construction of any gardens, platforms, or other areas located in the northwest corner of the Property to be used for conducting outdoor weddings at the Property,
 • a terrace adjacent to the patio on the southeast side of the building on the Property[,]
 • any pad, patio, platform, or foundation or other structure to be used in conjunction with tents, kitchens, bathroom facilities or storage areas for outdoor entertainment activity at the Property,
 • any permanent or temporary kitchen and/or bathroom facilities adjacent to the pad, patio, platform or other structure or staging area to be used for outdoor entertainment at the Property,
 • the construction of terraces and additions to the easterly side of the building on the Property[,]
 • the establishment of any permanent paved parking spaces on the former lawn area at the west, south and southwest part of the Property as shown on plans filed with the Zoning Officer,
 • the use of a driveway running between the Property and Cliff Avenue,
 • the narrowing of the Memorial Boulevard entrance to the Property."
Letter of Jon E. Cohen to Zoning Bd. of Review, (June 4, 2001). Thus, Cohen sought to collect the pieces of Cliff Walk's development project and challenge the project in its entirety.
While Cohen's appeal was pending, Cliff Walk continued with its efforts to obtain administrative approval for the project. On July 27, 2001, it obtained CRMC approval to "redesign and relocate parking area, install water quality management measures, inground pool, and landscaping:" (App. Ex. 2, Letter of CRMC
(July 27, 2001)). The approval specifically referenced and approved an 8 page plan entitled "The Chanler at Cliff Walk" and dated June 2001 and prepared by Northeast Engineers.[14]
Cliff Walk also continued with its construction of the alterations and additions to the exterior of the hotel, including the courtyard system at issue in this appeal. It also commenced tearing up the old parking lot.
On Sept. 11, 2001, after a request from John Shufelt and his architect, the Building Official, William Pasco, wrote a letter to Cliff Walk's architect in which Pasco stated that his inspections revealed the construction to have been "in substantial accord with approved plans, or with revised submittals, also approved." (Res. Ex. 9). The letter did not identify what plans or "revised submittals" were actually approved and was silent as to when or in what form these approvals may have been given. The letter was also silent as to what other aspects and phases of Cliff Walk's ongoing development project may also have been approved.
The Board held hearings on October 22, 2001 and on January 31, 2002.[15]
It was Cliff Walk's contention that Cohen's appeal to the Board was untimely. With respect to the December 8, 2000 zoning certificate, it argued that this letter constituted a binding approval of the proposed parking lot relocation and that the timeliness of Cohen's appeal should be measured against the date the zoning certificate was issued and not May 25, 2001 — the date that the May 22, 2001 Development Site Plan and Development Planting Plan were approved. With respect to Cohen's appeal, as it related to the other improvements to the hotel building and property, Cliff Walk argued that Cohen had been aware of its intentions with respect to the project since late 2000 and early 2001 when Cohen saw various versions of Cliff Walk's site plans, including the Proposed Lawn and Parking Plan, which revealed the existence of the balcony, stairs and courtyard systems. Thus, Cliff Walk argued that this knowledge created a duty to appeal the September 1, 2000 building permit and the various plans that had been filed in follow-up to it.
As a further defense to the appeal, Cliff Walk asserted an estoppel argument. It was Cliff Walk's contention that the facts and circumstances barred the City of Newport, acting through the Board, from rescinding or canceling the approvals conferred by the Building Official. In furtherance of this argument, Cliff Walk pointed to the Historic District Commission approval, the August 2000 CRMC approval, and the September 1, 2000 building permit. It argued that throughout the lengthy construction process, it had harbored a good faith belief that, by September 1, 2000, it had all of the necessary approvals to launch its development plans and that it relied on those approvals when it undertook to make the improvements to the property.
At the hearings, Cliff Walk's attorney testified that he met with Cohen in December 2000 and again thereafter in an effort to appraise Cohen of Cliff Walk's development concepts. (Testimony of Turner Scott, Tr. at 21, 28 (Oct. 22, 2001)). He further testified that he reviewed the Landscaping and Parking Plan (Res. Ex. 1) with Cohen, whose main objection was potential activity in the lawn area. He also testified that there were several iterations to Cliff Walk's development and site plans — some aspects of which changed and other aspects of which never changed. Id. at 43-45.
John Shufelt testified that it was in July 2000 that Cliff Walk developed its core plans to move the parking lot, to reconfigure the entrance to the hotel, to build the system of private entrances and courtyards and to renovate the hotel. (Tr. at 75-79 (Oct. 22, 2001)). He testified that between September 1, 2000 and June 4, 2001 when Cohen launched his appeal,
 "We put a new slate roof on the building; we put some architectural balusters on the roof of the building; we gutted the inside of the building; there were some structural areas that had not been caught by the structural engineers that needed some additional reinforcement, so I put a lot of steel into the building — it's going to be here another 150 years — we ripped out all the old electrical system; all the old plumbing system; ripped out all the plaster; reframed the inside of the building; put in all new electrical; rough plumbing; all new HVAC system; all new sprinkling system; fire alarm system; put fireplaces in each of the guest rooms; built the framing and the electrical plumbing for wet bars in each of the guest rooms; and the framing and plumbing for all of the bathrooms; we demolished the old decks on the outside; we built new decks on the outside; we ripped out some of the asphalt where the old parking lot was; cut down about ten trees; planted about 80 new trees. I'm sure we've done more." Id. at 126-27
He also testified that underground utilities had been installed and a new entry gate was in the making. Id. at 136-37. Shufelt testified that the changes to the hotel have been a work in progress and that changes were added as the project went along. (Tr. at 213 (Jan. 31, 2002)).
Shufelt further testified that a Cliff Walk employee had requested the September 1, 2000 building permit and that other plans — in addition to those provided at the hearing before the Board — had been submitted to the Building Official for purposes of obtaining that permit. (Tr. at 105-106 (Oct. 22, 2001)). Shufelt testified that as changes were made in the plans, his architect or other employees would provide the revisions to the building department and Historic District Commission. Id. at 106, 114 118. Shufelt testified that his architect obtained the September 11, 2001 letter from William Pasco after Shufelt had asked the architect to demonstrate that the appropriate building approvals had been obtained. Id. at 106.
Through Shufelt, Cohen introduced into evidence two iterations of Cliff Walk's development plans. The plans were entitled "Master Plan" and were dated January 12, 2001 (App. Ex. 10) and February 28, 2001 (App. Ex. 8), respectively. These Master Plans revealed the full extent of Cliff Walk's proposed project. They depicted additions to the property, along the easterly and northerly sides of the hotel building, in the form an interconnected system of balconies, private entry courtyards, decking and stairs, and a swimming pool and terrace (the northerly side of which encroached into the yard setback). The courtyards are depicted as being enclosed by walls which, via testimony before the Board, Shufelt revealed to be up to 10 feet in height in some areas. (Tr. at 244 (Jan. 31, 2002)). The Master Plans also showed a proposed carriage house and extensive gardens including a reflecting pool. After questioning by Cohen, Shufelt admitted that it remained his intention to design and construct the pool and terrace in a future phase of the project. Id. at 239. In an effort to keep the administrative review process fractionalized, Shufelt's attorney objected to evidence concerning the pool, arguing that Cliff Walk had not yet applied for a building permit for the pool and, therefore, questions relating to the pool were not properly before the Board. Id. at 285. Shufelt admitted, too, that he had not applied for a variance in order to obtain approval for the construction of the structures within the setbacks. Id. at 240. Finally, Shufelt conceded that the system of private courtyards, decking, stairs, pool and terrace and walls was not detailed in any plan submitted to the Building Official — either at the time that the defendant applied for the September 1, 2000 building permit or thereafter.Id. at 242-45.
Shufelt testified that in January 2001, he showed Cohen another iteration of his plans and proposed changes. Shufelt testified that he believed that the majority of the hotel's neighbors, including Cohen, were in agreement with his various proposals and that he relied on that in proceeding with his plans. (Tr. at 168 (Oct. 22, 2001)). Nonetheless, Shufelt also testified that from the time he first consulted with his attorney regarding his development project,[16] he was aware that there was a question of the hotel existing as a non-conforming use.
The Zoning Officer also testified at the hearing. He testified that he had informed Cliff Walk that it did not need zoning relief before making the architectural changes approved by the Historic District Commission. (Tr. at 269 (Jan. 31, 2002)). He also testified that he had reviewed Cliff Walk's various plans submitted to the Building Official and he confirmed that Cliff Walk's construction was substantially in accord with those plans.Id. at 260. He testified that he issued the December 8, 2000 zoning certificate approving Cliff Walk's October 26, 2000 request to move the parking lot because of a 1999 decision of the Board in which the Board purported to adjudicate questions concerning the use of the parking area. Id. at 264. He testified that, based upon what Cliff Walk had presented to him, he did not believe Cliff Walk needed any zoning approvals for its development plans. Id. at 266.
Noticeably absent from the proceedings before the Board were the Building Official or Cliff Walk's architect, construction manager or other employees — the only individuals who might shed light on which of Cliff Walk's development and construction plans or revised submittals had been approved, when they had been approved or the form of the approval. Expectedly, the Board's attorney pointed out to the Board that there was no evidence before it upon which it could conclude that any particular iteration of Cliff Walk's plans or revised plans had been deemed approved by the Building Official. (Tr. at 110 (Oct. 22, 2001)). Jon Cohen testified that he had been shown 5 or 6 iterations of Cliff Walk's development and site plans but that, seemingly, they were always in a state of flux. (Tr. at 282 (Jan. 31, 2002)). He testified that he understood the September 1, 2000 building permit to allow interior renovations only.[17] Id. at 293. He also testified that he did not look at the various plans that Cliff Walk had submitted to the building office but relied on the language of the permit and his observations of what was going on at the property, i.e. that it was being fixed up and Cliff Walk was replacing doors and windows. Id. at 300. Cohen testified that could not be sure what it was that Cliff Walk was actually intending to build until he saw the recent construction and additions to the north and east faces of the hotel — construction that he initially perceived to have been scaffolding. Id. at 289. Cohen also introduced evidence demonstrating that, although Cliff Walk admitted it had spent or committed to actual construction costs of over $6,000,000.00 purportedly in reliance on the September 1, 2000 permit, the estimated construction costs shown on the application for that permit were only $500,000.00. Cohen also produced photographs of the courtyard structures. (App. Ex. 11A, 11B, 12A, and 12B). The photographs clearly depict substantial additions to the hotel building as well as pedestrian entrances and exits. Cohen testified that Cliff Walk's additions to the hotel structure amounted to more than a 40% increase in the hotel's original footprint. (Tr. at 290 (Jan. 31, 2002)). Cohen testified that Cliff Walk continued with its construction of the courtyard system notwithstanding the pendency of his appeal. Id.
Thereafter, on October 29, 2002, the Board issued a written decision. In that decision, the Board found Cohen's appeal to be timely brought and it turned to the merits of his appeal. The Board approved the parking relocation and concluded that "since the approved parking is not a change of use, the Zoning Official's determination approving the parking in the southwest area of the property, on which the property owner relied in good faith, is affirmed." Decision of Newport Zoning Bd., In Re:Appeal of John E. Cohen, Re: Inn at Cliff Walk, Inc. d/b/a TheChanler, at 3 (Oct. 29, 2002). The Board apparently relied, in part, on its previous 1999 decision purporting to approve the general area of the proposed relocation as having been historically used by the hotel owners for paid parking,[18]
as well as Cliff Walk's reliance on the December 8, 2000 zoning certificate.
As to Cliff Walk's exterior alterations and additions to the hotel structure, the Board found that they would not expand or change the use of the property as a transient guest facility. In making this determination the Board relied upon its finding that the newly renovated hotel would have only twenty rooms, rather than the current twenty-two, and a smaller bar and, therefore, would reduce the intensity of the non-conforming use. The Board concluded that "since the exterior changes to the structure do not constitute a change in use, the actions of the Building Official and Zoning Official approving such changes, on which the property owner relied in good faith, are affirmed." Id. at 3.
Apparently, as was the case in the various other proceedings having to do with the Cliff Walk's project and which came before the Board, the Board's focus remained narrow and directed at isolated components of Cliff Walk's project only, i.e. the balcony/stair/courtyard systems and the change in the parking lot. The Board did not consider the full nature and extent of Cliff Walk's development project in toto. Nor did it attempt to determine whether the project, as a whole, was allowed by the Ordinance or whether a variance was required prior to the issuance of a building permit in furtherance of it. The Board did not make specific findings regarding the expansion of the hotel's physical size, whether Cliff Walk's alterations would change the character of the hotel use, whether the alterations went beyond ordinary repair and maintenance, whether the alterations exceeded mere replacement of existing materials, or whether they were undertaken for the purpose of protecting the public safety. Nor did the Board make specific findings concerning which iterations of Cliff Walk's construction and site plans it believed had been approved, by whom it believed them to have been approved, or when they may have been approved. Nor did it make findings concerning the nature and extent of Cliff Walk's reliance on such approvals.
Cohen filed a timely appeal to this Court on November 13, 2002. Cohen contends that Cliff Walk's changes to the property are prohibited by Ordinance § 17.72.030. Cohen also contends that the system of private balconies and courtyards constitute substantial alterations to the property prohibited by Ordinance
§ 17.72.030(C), and that the parking relocation contravenes § 17.72.030(B). Those sections provide, in pertinent part, that
 "[n]o nonconforming use of land, nonconforming use of a structure, or nonconforming structure shall be changed except to a conforming use or structure," Ordinance § 17.72.030C, and that "[n]o nonconforming use of land shall be moved to another part of a lot . . . and no nonconforming use of a building shall be moved or extended to any other part of the building not expressly arranged and designed for such use at the time the use became nonconforming. . . ." Ordinance § 17.72.030B.
Cliff Walk counters that § 17.72.030(C) prohibits only "changes in use" which, it argues, requires a use substantially different from the nonconforming use to which the premises are put. Thus, Cliff Walk urges, as long as the hotel remains a hotel its development plans are permissible if they do not violate any dimensional zoning requirements. Cliff Walk also asserts that its proposed courtyards and parking lot constitute allowable accessory uses. Finally, relying on the Board's 1999 decision, Cliff Walk argues that the area of the proposed parking lot has historically been used for parking and that merely paving it cannot constitute a change in use.
 Analysis A. Cohen Is an Aggrieved Party
Although the approvals referred to in the September 11, 2001 letter from the Building Official were not properly formalized, those approvals affected the substantial rights of Cohen who, as an aggrieved party, was entitled to appeal to the Zoning Board of Review, pursuant to G.L. § 45-24-64 and to this Court pursuant to G.L. § 45-24-69. And, although development plan approval is merely a predicate to the issuance of a building permit,[19] Cliff Walk, purportedly pursuant to the approvals referred to in the September 11, 2001 letter, has undertaken construction of the balcony-stair-courtyard system and other improvements shown on the May 22, 2001 plans, and has moved the parking lot purportedly pursuant to the December 8, 2000 zoning certificate which only stated that Development Plan Review was required. Because Ordinance § 17.88.070, provides that "no building permit shall be issued . . . except in accordance with the approved development plan," (emphasis added), zoning approval under the terms of the Newport Ordinance's development plan review process[20] is binding on any permit. Thus, to require a building permit before the zoning challenge here could be reviewed would be futile. Finally, even if the Ordinance does not require a building permit for alterations to buildings or structures where the use at issue requires development plan review, then Cohen was aggrieved by the Zoning Officer's approval of the plans.
B. The Board Did Not Err in Concluding that Cohen's Appeal from the Building Official's Decision to Approve the Cliff Walk's Construction Activities Was Timely Filed
Cliff Walk contends that Cohen's appeal was untimely because its building permit was issued almost a year earlier. However, the time for appeal[21] does not start as to "one allegedly aggrieved by the decision of a building inspector who has neither actual knowledge of that decision nor who, under the circumstances of a given case could be reasonably charged with such knowledge." Hartunian v. Matteson, 109 R.I. 509, 591,288 A.2d 485, 521 (1972). See also Zeilstra v. Barrington ZoningBoard of Review, 417 A.2d 303, 308 (R.I. 1980) ("a reasonable time for the appeal from the grant of a building permit does not necessarily begin to run the moment the permit is issued or the construction commenced. The time for [plaintiff's] appeal began to run when he became chargeable with knowledge of the decision from which he sought to appeal") (cite omitted). Here, there was ample evidence before the Board that Cohen could not be charged with notice that the building inspector had authorized the improvements in question. The September 1, 2000 permit did not mention the system of balconies, stairs and courtyards and even a careful inspection of the plans filed with the application for that permit would not uncover Cliff Walk's intentions concerning them. And, contrary to Cliff Walk's arguments before the Board and to this Court, Cohen's knowledge of its proposals did not create a justiciable controversy — it is knowledge of thedecision appealed from that begins the limitations period.Zeilstra, 417 A.2d. at 308. In fact, it is arguable that even knowledge of actual construction could not have charged Cohen with notice under the circumstances — at most, Cohen would have had notice only that Cliff Walk was abusing the permit and engaging in unauthorized construction activities that were being ignored by the zoning and building officers. It was only the late-appearing letter of September 11, 2001 that revealed the construction activities to be the product of an affirmative decision of the Building Official, rather than a product of the City's neglect in enforcing the zoning and building regulations.
As indicated previously, Cohen testified that although he had been shown various iterations of Cliff Walk's proposed plans, he could not be sure what it was that Cliff Walk was actually intending until the construction was underway. He testified that he initially believed the work on the reconfigured decks to have been scaffolding. Furthermore, the record clearly revealed that written confirmation of the "approvals" given to Cliff Walk came months after Cohen claimed his appeal to the Board. Thus, there was substantial evidence before the Board to support its finding that Cohen's appeal from the Building Official's decision to approve Cliff Walk's construction activities was timely filed.
C. The Board Did Not Err in Concluding that Cohen's Appeal from the Zoning Officer's Approval of the Development Site Plan and Development Planting Plan Was Timely Filed
Cliff Walk contends that Cohen's appeal was untimely as to the development plan review approval because, on December 8, 2000, Cliff Walk received a zoning certificate purportedly allowing the proposed change to the parking lot location, of which certificate Cohen had notice. Putting aside the question of whether a zoning certificate can operate as final administrative approval,[22] there was abundant evidence before the Board to support its finding that Cohen's appeal to the approval of the development plans was timely filed.
There was evidence before the Board that the December 8, 2000 zoning certificate expressly stated that the layout of the parking spaces as shown in the November 15, 2000 Proposed Landscaping and Parking Plan were in conformity with the Newport Zoning Ordinance, but that development plan review was required before the changes shown by the Plan could be approved. Thus, the certificate itself did not purport to authorize the relocation of the parking lot, as did the Zoning Officer's May 25, 2001 approval of the May 22, 2001 Development Site and Development Planting Plans. There was also evidence before the Board that Cliff Walk did not receive CRMC approval for the change in site for the parking lot until after Cohen's appeal was filed and that, therefore, the zoning certificate, to the extent it could be said to operate as some form of administrative approval, remained ineffective.[23] The evidence before the Board also was that Cohen appealed the May 25, 2001 approval of the development plan within 10 days. Therefore, the Board did not err in finding Cohen's appeal to be timely filed.
D. The Board's Approval of Cliff Walk's Exterior Alterations and Changes to the Parking Area Was Affected by Error of Law and Was Clearly Erroneous in View of the Reliable, Probative, and Substantial Evidence of the Whole Record due to Cliff Walk's Status as Non-Conforming Development
Turning to the merits of Cohen's appeal, it is necessary to determine, at the outset, whether the parties correctly agree — for purposes of Part I of this consolidated appeal — that the property exists as a nonconforming development and, if so, what implications must follow. Although not squarely presented to the Court, the determination of the property's zoning status is essential to the Court's determination of the propriety of the defendant's various attempts to gain administrative approval for its development project and to the resolution of the issues on appeal from the Board, namely, (1) the propriety of the Board's decision that the changes in the parking lot and the exterior changes to the structure do not constitute a change in use and are, therefore, permitted by the Ordinance, (2) the propriety of Cliff Walk's "approvals," and (3) whether Cliff Walk's permits and "approvals" are immunized from cancellation on grounds of estoppel.
Mirroring G.L. § 45-24-31(49), Ordinance § 17.08.010 defines "Nonconformance" as a "building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of this zoning ordinance and not in conformity with the provisions of this zoning code or amendment." A plain reading, giving the words their ordinary meaning, identifies two ways existing development will become nonconforming. First, any development that was lawfully[24] in existence before the Ordinance was adopted, but which was not in conformity with the code or Ordinance as adopted, would be deemed a nonconformance. Second, any development that is lawfully in existence before the code or Ordinance is amended, but which is not in conformity with the provisions of the amendment, would also be nonconforming.See also Health Havens, Inc. v. Zoning Bd. of Review of theCity of East Prov., 101 R.I. 258, 264, 221 A.2d 794, 798 (1966) (reenactment of ordinance upon adoption of new city charter was "not the adoption of a new zoning ordinance so as to make all pure special exceptions and variances theretofore granted by the board legal nonconforming uses").
As to the instant case, the hotel was lawfully established with Board approval, under the ordinance in effect in 1945. However, in 1977, the ordinance was amended. Pursuant to that amendment, the district in which the hotel was located was zoned as an R-20 district. In such districts, hotels were not permitted by special exception or otherwise. And, in 1994, the City of Newport reenacted and adopted Title 17 of the City of Newport Codified Ordinances, pursuant to the Rhode Island Zoning Enabling Act of 1991. The new ordinance incorporated the R-20 zoning district in which the property was located and continued to prohibit hotels.See Ordinance § 17.28.020. Thus, as early as 1977, the hotel, its existence having been lawfully established at the time it came into being, was rendered nonconforming by an amendment to the Ordinance and, therefore, continued to exist lawfully by virtue of its `grandfather' rights only. See Ordinance § 17.72.020.
Despite the public policy of zoning "to abolish nonconforming uses as speedily as justice will permit," RICO Corp. v. Town ofExeter, 787 A.2d 1136, 1145 (R.I. 1999) (quotes omitted), §45-24-40 of the Zoning Enabling Act bestows upon towns the power to authorize the alteration of nonconforming developments. The section provides:
 "(a) A zoning ordinance may permit a nonconforming development to be altered under either of the following conditions:
 (1) The ordinance may establish a special-use permit, authorizing the alteration, which must be approved by the zoning board of review following the procedure established in this chapter and in the zoning ordinance; or
 (2) The ordinance may allow the addition and enlargement, expansion, intensification, or change in use, of nonconforming development either by permit or by right and may distinguish between the foregoing actions by zoning districts."
It is clear from the statutory language that alteration[25]
of nonconforming development[26] may be achieved only when permitted by an ordinance and, when so permitted, it may be permitted by two means only. If a municipality allows alteration of non-conforming development, it may establish, in its ordinance, a special-use permit process for that purpose, G.L. §45-24-40(1),[27] or it may provide for the "enlargement, expansion, intensification, or change in use, of nonconforming development" by permit or by right in designated zoning districts. G.L. § 45-24-40(2). "It is well settled that when the language of a statute is clear and unambiguous, [a] Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." RIH MedicalFoundation, Inc. v. Nolan, 723 A.2d 1123, 1126 (R.I. 1999) (quoting State v. DiCicco, 707 A.2d 251, 253 (R.I. 1998)). And, "when confronted with an unambiguous statute, [the Court] must apply the statute as written." Id.
Although G.L. § 45-24-40(a)(1) (2) enable the right to alter nonconforming development, G.L. § 45-24-40(c) goes on to limit that right for certain uses by providing that "[a] use established by variance or special use permit shall not acquire the rights of this section." Thus, the legislature made it quite clear that where a nonconforming use has come into being, albeit lawfully, by way of a special use permit or variance, it cannot acquire rights enabled by G.L. § 45-24-40(a)(1) (2).[28]
That aside, however, the Newport Zoning Ordinance does not establish a special-use permit for alterations in any
nonconforming development, as authorized by §§ 45-24-40(a)(1) 
(2). Nor does the Ordinance allow expansion, enlargements, intensifications, or changes in the use of non-conforming development either by permit or by right. In fact, where the Ordinance does address itself to non-conforming development, it imposes restrictions only — as opposed to providing the owner of non-conforming development with opportunities for relief.Ordinance § 17.72.030B and C.[29] The only safe harbor extended to an owner of non-conforming development is contained in § 17.72.030A, which allows a property owner to, (1) strengthen or restore to a safe condition any non-conforming structures declared to be unsafe by decree of any public safety official, and, (2) perform ordinary repair and maintenance or replacement of existing materials, so long as that work does not increase the nonconformity of thereof. Id. § 17.72.030A.[30]
By failing to accept the State Legislature's invitation to permit the alternation of nonconforming uses and the structures that house them, and by expressly excluding the extension or moving of such development, the drafters of Newport's Ordinance held true to the stated intent of permitting "nonconformities to continue until they are removed or abandoned." Ordinance § 17.72.020. The restrictive provisions of the Ordinance properly recognize that "[n]onconforming uses are a thorn in the side of proper zoning and should not be perpetuated any longer than necessary." RICO, Corp., 787 A.2d at 1145 (quoting Inhabitantsof Windham v. Sprague, 219 A.2d 548 (Me. 1966)). These provisions codify
 "the common-law rule that the right which a nonconforming owner has is only that which existed on the effective date of the ordinance which made the use nonconforming, the limits of which are marked by character, size and degree of use as it then existed." 4 Rathkopf, The Law of Zoning and Planning, § 73:6 (2002).
Thus, by refusing to allow the owner of nonconforming development to breathe new life into the property when it has lost its own ability to survive by, e.g., market or social forces, the Newport Ordinance accomplishes fully the "overriding public policy" of eventual elimination of nonconforming uses.RICO, 787 A.2d at 1145 (quoting Toys "R" Us v. Silva,89 N.Y.2d 411, 654 N.Y.S.2d 100, 676 N.E.2d 862, 865 (N.Y. 1996)). It is evident from the plain language of the Ordinance and the public policy it embraces that, in Newport, the only way in which an owner of nonconforming development may alter that development is to apply for a variance to depart from the literal requirements of the Ordinance and to prove, among other things, unnecessary hardship.[31] Ordinance § 17.108.010.
The overwhelming evidence before the Board was that Cliff Walk's alterations and additions were part of a multi-phased development project designed to transform the existing building into a "150-year" structure and to transform the property and business, over all, from a local inn into an exclusive, world class destination spa and hotel. There was no evidence whatsoever that Cliff Walk's construction was necessitated by any of the limited purposes anticipated by the Ordinance, i.e., to maintain and repair the hotel's physical structures, to ensure the public safety, or to replace existing materials. Even ignoring the totality of Cliff Walk's ongoing development project and the question of whether that project, as a whole, would work a prohibited change in the use of the hotel property, the evidence before the Board was that the challenged development — balconies, stairs, courtyards, walls, changes to the parking area and other anticipated improvements such as the patio and swimming pool — would amount to a substantial alteration in the nonconformity and would be far beyond that allowed by the Ordinance. 4 Rathkopf,supra., § 73:16 ("courts have held that the test for illegal alterations is whether the alterations tend to extend the nonconforming use and the life of the nonconforming building. . . . Unauthorized enlargement or extension has been found in the extension of or addition to a building previously used in the exercise of a nonconforming use"). Thus, at the very least, the exterior additions and alterations, including the parking lot changes, could not be undertaken in the absence of a variance, and the Board erred in thinking that they were permissible because they did not amount to a change in use. Therefore, Cohen's appeal must be granted and the Board's decision reversed as in excess of its statutory authority, in violation of statutory and ordinance provisions, and clearly erroneous in view of the reliable, probative, and substantial evidence of the record.
E. The Board's Approval of Cliff Walk's Exterior Alterations Was Affected by Error of Law, Made upon Unlawful Procedure, and Was in Excess of the Authority Granted to the Zoning Board of Review due to Cliff Walk's Failure to Obtain Development Plan Review Prior to the Issuance of a Building Permit.
Cliff Walk's failure to apply for proper development plan review prior to its application for its building permits and other "approvals" underlies its success in fragmenting administrative approval for its project and is the undergirding of Cohen's complaints. By leapfrogging over the development plan review process at the outset, Cliff Walk ensured that its development project would escape administrative scrutiny as a whole. Cliff Walk continued on the same path when it attempted to limit its belated May 22, 2001 request for development plan review to the parking area changes and landscaping plan only.
Pursuant to G.L. § 45-24-31(21), "Development Plan Review" ("DPR") is a "process whereby authorized local officials review site plans, maps, and other documentation of a development to determine the compliance with the stated purposes and standards of the ordinance." G.L. § 45-24-31(21). In conducting the development plan review at issue in this case, the Zoning Officer presumably was intending to exercise powers under Ordinance § 17.88.010, which authorizes the director of the department of planning, zoning, development and inspections to serve as review coordinator and review agent for development plan review.[32] According to the Ordinance, the intent behind development plan review is, among other things, "to provide a more healthful and pleasing environment, ensure adequate provision of services and to promote the overall public health, safety and general welfare of the community and its citizens."Ordinance § 17.88.060. Consistent with these stated goals, Newport's development plan review process affords local permitting authorities the opportunity to review the nature and extent of the development that is being proposed — in order that the project's impact upon the community can be assessed prior to the issuance of any building permits.
With respect to Newport's development plan review process, the Ordinance clearly states: "[i]t shall be unlawful for any person to construct, erect or alter any building or structure, or develop, change or improve land for which a development plan is required, except in accordance with the approved development plan." Id. § 17.88.080. The Ordinance also states that
 "[n]o building permit shall be issued to construct, erect, or alter any building or structure, or develop, change or improve land for which a development plan is required, except in accordance with the approved development plan. The approved development plan. . . . shall become part of the application for a building permit and shall be binding on any building permit issued." Id. § 17.88.070.
The Ordinance also requires that the contents of a development plan be detailed and include, inter alia, landscaping and parking plans, the location and square foot of buildings proposed, as well as the location and dimensions of pedestrian entrances, exits and walkways. Id. § 17.88.030. Significantly, the Ordinance also requires that for any project which is proposed to be constructed in more than one phase, that fact should be clearly indicated on the development plan. Id. § 17.88.030(E)(2). Finally, the Ordinance requires that any substantial modification or revision to a development plan requires re-submittal as for a new plan. Id. § 17.88.100. Pursuant to the Ordinance, development plan review is required for both transient guest facilities and parking lots for over 10 vehicles. Id. at § 17.88.029(A) and (G).
Therefore, assuming the validity of the provisions of the Newport Zoning Ordinance having to do with development plan review,[33] and even assuming that Cliff Walk's plans could have properly been approved otherwise, Cliff Walk was required to obtain development plan approval prior to obtaining the September 1, 2000 and other building permits and not after. The Board thus exceeded its authority when it approved Cliff Walk's construction in the face of Cliff Walk's failure to follow the proper administrative procedures — procedures that would have required Cliff Walk to commit to and publicly disclose the true nature and extent of its multiphased development plan, would have incorporated that plan into any building permit issued in furtherance of it, and would have facilitated orderly administrative review of its project as a whole. Thus, the Board's decision was affected by error of law, in violation of ordinance provisions, made upon unlawful procedure, and in excess of the authority granted to the zoning board of review by ordinance provisions.
F. The Board Erred When It Failed to View the Alterations to the Property in Their Entirety
At Cliff Walk's urging, the Board examined isolated, individual components of Cliff Walk's development project without considering it as a whole. In doing so, the Board made a fundamental mistake in its approach to the questions before it. The question for the Board was not whether a courtyard or balcony or a parking lot constituted a change in use or even a nonconforming use, the question was whether the alterations proposed for this non-conforming development were beyond the scope of those permitted by the Ordinance. The Board was required to consider the nature and extent of the project as a whole and, against that backdrop, determine whether or not Cliff Walk's development plan and/or its proposed renovations were permitted by the Ordinance. If Cliff Walk's plans or renovations were illegal for the reason that they exceeded that which was allowed by the Ordinance — which the record evidence reflects is the case — the Board erred in approving alterations undertaken in furtherance of that plan. Instead, the Board seemingly focused on distinctions between use and structure. The Board considered "whether the exterior renovations . . . constituted a change in use of the property as a transient guest facility," and concluded that they did not. It found that the property would still constitute a transient guest facility and, relying only on the numerical difference between the existing 22 rooms and proposed 20, concluded that the use would be less intense. The Board's determinations, reflecting its legal conclusion — that where the development in question is nonconforming by use, physical alterations that do not change the class or intensity of the use are permitted of right under the Newport Ordinance, regardless of physical enlargement or extent of alteration — are affected by error of law. The Board's clearly erroneous conclusion is belied by an examination of the Newport Zoning Ordinance and the Zoning Enabling Statute, which, as previously discussed herein, do not provide for alterations to nonconforming development — even those which fall short of a change in use.[34] However, even if Cliff Walk's grandfather rights have not terminated due to a substantial change in use, Cliff Walk's renovations are plainly illegal to the extent they exceed the allowed repairs, maintenance and replacement of existing materials.
G. The Board Erred in Concluding that Cliff Walk Was Entitled to the Benefit of Principles of Estoppel
It was Cliff Walk's contention that by September 1, 2000 it harbored a good faith belief that it had all of the approvals necessary to carry out the construction of the system of balconies, stairs, and courtyard systems, and that any subsequent changes in its plans for those additions were insubstantial. Cliff Walk contended that its alterations and additions were well within that which was approved and authorized by the City. Cliff Walk further contended that its September 1, 2000 building permit should not be cancelled or rescinded because it had undertaken millions of dollars of construction in reliance on that permit.
It is clear from the evidence that the building permit of September 1, 2000 allowed defendant only to "relocate non-bearing partitions, remove ceilings, replace windows on 1st, 2nd, 3rd floors. Install exterior doors, per plan." It did not, as Cliff Walk contends, and the Board quite apparently found, approve the plans in full. Cliff Walk's interpretation of the sentence "[i]nstall exterior doors, per plan," is not only absurd, but it also violates general requirements regarding the application and issuance of building permits.
The state law is clear that construction, such as that carried out by Cliff Walk, must be undertaken pursuant to local authorization in the form of a building permit, without which the construction is plainly illegal. Any other form of "approval" is unauthorized. Rhode Island General Laws 1956 § 23-27.3-113.4 of the State Building Code requires an application to "contain a general description of the proposed work . . . the facts contained in each application are to be certified by the applicant under oath." Clearly, a drawn plan is not a statement of facts. Furthermore, G.L. § 23-27.3-113.5 provides for the submission of "[p]lans and specifications" with the application. Thus, the application itself must contain a general description; the plans may not be submitted as the sole indication of the proposed development, to be deciphered and interpreted by the building inspector or the public. And, because the building inspector may not issue a permit for work beyond that proposed, G.L. § 23-27.3-114.1, the September 1, 2000 building permit could not authorize work for which Cliff Walk had not properly applied.[35] Thus, Cliff Walk was not entitled to rely upon the September 1, 2000 permit as authorizing it to construct the additions at issue and, if it did, its reliance was unjustified. Cf. Town of Johnston v. Pezza, 723 A.2d 278, (R.I. 1999) (recipient of permit issued before required site plan approval was not entitled to rely thereon).
Furthermore, in his testimony before the Board, Cliff Walk's principal admitted that Cliff Walk undertook construction "muchmore extensive than what it says on the permit" and that Cliff Walk not only commenced "gutting the building," but also made "all kinds of architectural changes on the outside of thebuilding with regard to the columns, reconfiguring the decks,[and] building the courtyard. . . ." (Tr. at 103-104 (Oct. 22, 2001)) (emphasis added). Finally, as noted earlier in this decision, Shufelt also conceded that the courtyard systems did not appear on the plans submitted to the Building Official when Cliff Walk applied for the September 1, 2000 building permit. (Tr. at 242-45 (Jan. 31, 2002)). The uncontroverted evidence before the Board was that, except for the September 1, 2000 permit and the permits having to do with the electrical, plumbing and similar mechanical work, Cliff Walk simply failed to apply for any building permit for the purpose of constructing its presently existing system balconies, stairs, courtyards, and walls.
Likewise, with respect to the Building Official's other "approvals," it was Cliff Walk's legal obligation to apply for the necessary building permits to accomplish its construction and, therefore, Cliff Walk cannot hide behind its failure to do so. Had Cliff Walk followed the proper administrative procedures and received proper building permits for the exterior alterations and additions, the opportunity for Cohen and others to challenge Cliff Walk's plans would have arisen before Cliff Walk changed its position. The evidence was that Cliff Walk had been informed by the Zoning Official that exterior alterations in the form of additions to the property were "strictly prohibited" by the Ordinance. The evidence was also that Cliff Walk, having applied for and received over a dozen building permits, was quite familiar with the process involved in obtaining a building permit but that, when it undertook to construct these particular additions — construction activities which it clearly knew were likely to raise the ire of its neighbors — Cliff Walk sought approvals in a form not authorized by law. Thus, Cliff Walk was not entitled to rely upon these unauthorized approvals. "An actor may not base a claim of estoppel in its favor upon its own wrongful acts." Wellington Hotel Associates v. Miner,543 A.2d 656, 661 (R.I. 1988) (citing Erlich v. First National Bank ofPrinceton, 208 N.J. Super. 264, 303-04, 505 A.2d 220, 241 (1984)). And cf., 4 Rathkopf, supra., § 70:30 ("bad faith has been equated, at least in consequence, with carelessness on the part of the landowner").
Furthermore, as previously discussed, Cliff Walk also failed to obtain development plan approval as required by Ordinance § 17.88.060. Given the language of the Ordinance, it is plain enough that any appeals taken from the issuance of permits applied for in furtherance of approved development plans would necessarily trigger scrutiny of the proposed project as a whole. Had Cliff Walk applied for and obtained development plan approval prior to obtaining the September 1, 2000 building permit and other "approvals," questions concerning its right to construct the alterations and additions at issue could have been joined at the outset, and Cliff Walk would not have fallen into its present position. Thus, Cliff Walk may not now complain that it justifiably relied upon its own failure to follow the law. Seeid.
Nor is the Building Official's failure to enforce the legal requirement for a written application of any benefit to Cliff Walk. Cliff Walk was at its peril when it determined to seek, and apparently received, the unauthorized approvals referred to in the Sept. 1, 2001 letter, and when it undertook construction for which it did not seek development plan review, and which was outside the scope of its limited building permit (whether properly issued or not). Absent Cliff Walk applying for and obtaining development plan review and the necessary variances, neither the Zoning Official nor the Building Official had authority to issue permits or provide "approvals" for alterations that do not fall within § 17.72.030A and other applicable provisions of the Ordinance. Therefore, Cliff Walk's estoppel argument must necessarily fail. See Almeida v. Zoning Board ofReview of Tiverton, 606 A.2d 1318, 1321 (R.I. 1992) (plaintiffs not entitled to rely on permit to build basement apartment where district was zoned only for single-family use); Town of Johnstonv. Pezza, supra., (recipient of permit issued before requires site plan approval was not entitled to rely thereon); Town ofCharlestown v. Beattie, 422 A.2d 1250, 1252 (R.I. 1980) ("an act of the building inspector which is a nullity cannot vitiate the town's right to have zoning violations enjoined"); TechnologyInvestors v. Town of Westerly, 689 A.2d 1060, 1062 (R.I. 1997) ("estoppel cannot be applicable when the municipality's acts were clearly ultra vires").
The Board also erred when it extended the benefits of estoppel to Cliff Walk with respect to the changes in the parking area. The uncontroverted evidence before the Board was that Cliff Walk's changes to the parking area were part of its core development plans as early as July 2000, and, furthermore, the December 8, 2000 zoning certificate contained language reminding Cliff Walk that development plan review was required for approval of the those changes. Furthermore, CRMC approval of the parking area relocation was not forthcoming until after Cohen's appeal had been filed, and CRMC's approval contained language plainly indicating that all applicable local approvals would be required. Thus, the evidence before the Board was that Cliff Walk had not completed the approval process for its proposed changes to the parking area. Therefore, if Cliff Walk changed its position by undertaking construction for which it had no final approvals, it necessarily did so at its own peril. Bald statements of good faith reliance without showing that the reliance is justified cannot support an estoppel defense. See, e.g., Casa DiMario,Inc. v. Richardson, 763 A.2d 607, 611 (R.I. 2000). Therefore, the Board both erred and abused its discretion in extending the right of estoppel to Cliff Walk with respect to the parking area changes.
Finally, it is crystal clear from the record that Cliff Walk's efforts to splinter administrative approval for its project were calculated and were designed to ensure that the Board would focus on isolated elements of Cliff Walk's proposed alterations — as opposed to considering the project as a whole in order to determine whether the proposed alterations to the property were such that a variance was required. At Cliff Walk's insistence, the Board and other administrative officials for the City ignored the ongoing objections of Jon Cohen and allowed themselves to become mired in a series of hearings or proceedings, each having to do with a separate aspect of Cliff Walk's development plan. Thus Cliff Walk's current predicament is very much a product of its own devices.
Accordingly, the Board's finding that Cliff Walk was entitled to the benefit of an estoppel defense was affected by error of law, was clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record, and constituted an abuse of discretion.
H. Absent a Variance, neither the Proposed Parking Area nor the Exterior Additions Are Authorized as Accessory Uses or Accessory Structures.
Cliff Walk asserts that its construction of the parking lot is permitted as an accessory use. Cliff Walk is incorrect. An accessory use or structure is one "customarily incidental and subordinate to the principal use of the land or building," and is not "permitted without the principal use to which it is related." G.L. § 45-24-31(3); Ordinance, § 17.08.010. Because an accessory use derives its existence and character from the principal use, necessarily Cliff Walk's parking area and exterior alterations are not accessory uses or structures permitted by right, absent an Ordinance provision specifically authorizing accessories-to-nonconforming-uses of right. So, even assuming, arguendo, that both the parking area and the exterior alterations would indeed constitute accessory uses or structures, they are necessarily a component of the nonconforming development, which cannot be altered absent a variance.[36]
Furthermore, pursuant to Ordinance § 17.28.020(10), accessory uses are permitted of right in R-20 residential districts only where the principal use is specifically identified as one of nine enumerated permitted uses. Because transient guest facilities are not among the nine, the proposed parking lot and other alterations cannot be considered accessory uses or structures that are permitted by right in order that Cliff Walk may escape the requirement of a variance therefor.
 Conclusion
The Board's decision to "confirm" the Building Official's purported approval(s) of the addition of the balconies, stairs, and walled courtyard systems was affected by error of law, was clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record, was in violation of statutory and ordinance provisions, and was characterized by an abuse of discretion. Because the substantial rights of Cliff Walk's neighbors, including Cohen, have been prejudiced, the Board's decision confirming the Building Official's approvals must be reversed. Likewise, the Board's decision to confirm the Zoning Officer's determination approving the changes to the parking area was clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; was characterized by an abuse of discretion; was in excess of statutory and Ordinance provisions; and, again, prejudiced the substantial rights of the Inn's neighbors, including Cohen. Accordingly, the Board's decision to allow the Zoning Officer's approval to stand must also be reversed.
 PART II — THE INN AT CLIFF WALK, INC.
This appeal is before the Court in response to an August 27, 2001 decision of the Zoning Board of Review for the City of Newport ("Board"). Inn at Cliff Walk, Inc. contends that the Board erred in its response to a G.L. § 45-24-54, and its correlative Ordinance § 17.112.010B.12, informational request that plaintiff's use of tents for entertainment and social functions on its property amounts to a legal nonconforming use, rather than as a special exception. Inn at Cliff Walk, Inc. also contends that the Board erroneously and arbitrarily placed limits on the use of such tents.
 Facts/Travel
As indicated, Nicholas, Inc. is the owner of a real estate in Newport, Rhode Island The real estate is located on Memorial Boulevard, Tax Assessor's Plat 31, Lot 1, ("the property"). A hotel business, now known as The Chandler, is located on the site and is owned and operated by the Inn at Cliff Walk, Inc. At one time the hotel was known as The Cliff Walk Manor. The hotel became operational in 1945 when its then-owner obtained approval of the City of Newport Zoning Board to operate the hotel.
In late 2000, after John Shufelt purchased Nicholas, Inc. and Inn at Cliff Walk, Inc. with the intent of continuing the hotel operation and undertaking substantial improvements to the existing development, as well as making new improvements to the property, Shufelt and his companies ("Cliff Walk") caused four letters to be sent to Guy Weston, Zoning Officer for the City of Newport ("Zoning Officer"), the purpose of which were to obtain various administrative rulings concerning the property and Cliff Walk's development proposals. Because these letters are critical to the disposition of this case, this Court will discuss them inseriatim.
On October 26, 2000, Cliff Walk's attorney sent three letters to the Zoning Officer. In a letter that bore the caption, "RE: Request for zoning certificate — Refrigeration Unit," Cliff Walk pointed out that the hotel was a non-conforming use, but, nonetheless, argued for a zoning certificate confirming that the installation of a proposed refrigeration unit would not "be an enlargement or increase in the non-conforming use of the property, but merely an insignificant change that requires no approval." Letter from Turner C. Scott to Guy Weston, ZoningOfficer, City of Newport, "Request for Zoning Certificate —Refrigeration Unit" at 1 (Oct. 26, 2000).
In another letter, sent on October 26, bearing the caption, "RE: Request for Zoning Certificate — Parking Area," Cliff Walk plainly and clearly requested a zoning certificate containing a statement or opinion that a proposed plan to relocate an existing parking lot to another area on the property would be permissible.
The final letter, also sent on October 26, bore the caption, "RE: Request for Zoning Certificate — Use of common area." In that letter, Cliff Walk described the hotel's history, particularly as it related to use of the hotel's lawn area as a function service area replete with alcoholic beverage license. In the letter, Cliff Walk argued its legal position that "[t]his use of the lawn is certainly one that has acquired rights pursuant to R.I. § 45-24-39 and Ordinance § 17-72-020."[37] Letterfrom Turner C. Scott to Guy Weston, Zoning Officer, City ofNewport, "RE: Request for Zoning Certificate — Use of CommonArea" at 2 (Oct. 26, 2000). The letter then described certain proposed development including installing a permanent patio area, bathroom facility, food-service staging area, and a swimming pool. Cliff Walk argued that "[f]rom my review of the Rhode Island General Laws and the City Ordinances, the anticipated improvements do not conflict with the past use of the lawn area and are not in violation of the City Ordinances." Id.
Immediately thereafter, in a closing paragraph, Cliff Walk requested the officer's "opinion on this issue." Id.
Subsequently, on November 22, 2000, Cliff Walk sent a fourth letter, which bore the captions of the previous two letters having to do with the parking area and use of the common area, and was introduced as "a follow-up to those letters of October 26, 2000 concerning the above-captioned property and matters."Letter to Guy Weston, Zoning Officer, City of Newport at 1 (Nov. 22, 2000). The letter discussed the proposed improvements to the property, referencing attached plans and site map. Cliff Walk concluded the letter stating, "I invite any opportunity to discuss this matter with you further so that my clients canproceed with the improvements as shown on the plan." Id. at 2. (Emphasis added).
The Zoning Officer responded to this sequence of letters, purporting to be requests for Zoning Certificates pursuant to G.L. § 45-24-54 and Ordinance, § 17.112.010, on October 31, 2000 and again on December 8, 2000 in two documents each of which was denominated as a "Zoning Certificate." The certificate of October 31, 2000 stated that the use of the property as a transient guest facility is a non-conforming use located in an R-20 Residential District, as well as within the local Historic District. It also stated, "Your letter of October 26, 2000 indicates that the owner wishes to add a 14 ft. x. 18 ft. freezer addition to the exterior of the building. Section 17.72.030, entitled `Alteration to nonconforming development,' strictly prohibits such an addition." Zoning Certificate, Guy Weston,Zoning Officer, City of Newport, to Turner C. Scott (Dec. 8, 2000).
The certificate of December 8, 2000 acknowledged the property to be a transient guest facility, acknowledged the lot to be an existing, conforming lot, and further stated that the property "is in compliance with all applicable zoning regulations."Zoning Certificate, Guy Weston, Zoning Officer, City of Newport,to Turner C. Scott (Dec. 8, 2000). The Zoning Officer went on to inform Cliff Walk that the proposed layout of the parking spaces was permitted under the zoning ordinance, but the certificate also stated that the proposed off-street parking changes must be reviewed as a development plan. The Zoning Officer did not address the proposed improvements to the lawn area.[38]
Thereafter, Cliff Walk filed a document entitled "Notice of Appeal" with the City of Newport Zoning Board of Review ("Board"). In its notice of appeal, Cliff Walk pointed to the zoning certificate issued December 8, 2000 and to three of the four letters sent by it to the Zoning Officer and ". . . request[ed] . . . a determination of the use of the . . . property. . . ."[39]
The Board held a public hearing on May 29, 2001, during which Cliff Walk described its property as a 24-room hotel undergoing major renovations. Although Cliff Walk agreed that the zoning certificate request that was before the Board was the October 26, 2000 request concerning the proposed improvements to the lawn common area, Cliff Walk nonetheless attempted to redirect the Board's focus by contending that the issue before the Board was to "either confirm or deny the longstanding right of this property to use this lawn for placement of tents for public and private events." (Tr. at 10 (May 29, 2001)).[40] During the course of the hearing, Cliff Walk presented evidence in an attempt to show that the hotel's legal status was that of a special (or conditionally) permitted use. Cliff Walk also presented evidence of the former owners' previous use of tents on the property.
One of the hotel's neighbors, Jon E. Cohen, appeared at the hearing. Expressing frustration at the seemingly convoluted process through which Cliff Walk was attempting to gain approval for extensive renovations, Cohen posited that "[t]here's all kinds of changes to the land and grounds. Shouldn't all of those issues be before the Board? It shouldn't be just to decide the tent issue. That's not the only issue before the Board, and it should be the entire operation of the property." Id. at 7. Cohen's complaints were rebuffed by Cliff Walk's attorney, who warned the Board that Cohen was trying to confuse the issues and that the questions before the Board were narrow ones. Id. at 8.
Thereafter, on August 17, 2001, Cliff Walk filed a memorandum with the Board in which it contended, once again, that its G.L. §45-24-54 request for a zoning certificate should be deemed changed from one concerning the use of the common areas and proposed development of it, including construction of a patio, bathrooms and a permanent food service station, to one concerning the use of temporary tents on its property in conjunction with social functions. As Cliff Walk stated in its memorandum to the Board:
 "The letters to Mr. Weston dated October 26, 2000 and November 22, 2000 while originally dealing with the hotel's right to make certain improvements in order to facilitate continued use of the lawn area should now be read as simply a request for a Zoning Certificate which states the use of tents on the lawn areas for varied functions continues to be permitted as they have in the past." (Appellant's Mem. to Zoning Bd. of Newport, In Re: Appeal of Inn at Cliff Walk, Inc. at 2).
Cliff Walk went on to claim that the Board had before it only two questions: (1) whether the lawn had historically been used for outside events under tents, and, (2) the "completely separate and distinct" question of whether the hotel existed as a conditionally permitted use, (alternatively, "special use"), or as a legally nonconforming lot. Memo to Board at 3-4.[41]
Thus, Cliff Walk invited the Board to render advisory rulings or declarations concerning two issues of significance to Cliff Walk — rather than to merely supply the remainder of information originally requested of the Zoning Officer but which the officer failed to give.
The Board held another public hearing on August 27, 2001. At that time, the Board members agreed that they would also address the plans to construct a permanent staging and patio area, as well as a bathroom facility, i.e., the subjects of the letter that were also unaddressed by the zoning certificate. (Tr. at 10 (Aug. 27, 2001)). During the course of the hearing, the Board members rightly referred to the various proceedings having to do with the hotel as a "mess." Id. at 10. The record reveals the Board members' confusion concerning the nature of the proceedings before them, the contents of Cliff Walk's original request for a zoning certificate, and what it was that Cliff Walk was actually seeking. The Board members concluded, inter alia, that the hotel existed as a legal non-conformity.
Thereafter, the Board issued a written response denominated as a "decision" in which it made findings of fact and in which it (1) denied Cliff Walk's appeal insofar as Cliff Walk sought to establish that the hotel existed as a special or conditionally permitted use;[42] (2) denied Cliff Walk's appeal insofar as it sought to establish that the use of tents over a permanent patio, bathroom structure, and staging area would be a permitted expansion of the nonconforming use; and (3) granted Cliff Walk's appeal to the extent it determined that the use of temporary tents in conjunction with the hotel use is an extension of a non-conforming use enjoying grandfathered rights. The Board also stated that the continued use of the tents, as previously used, would amount to a permitted, non-conforming use provided they were (a) used only during the summer; (b) erected separately for each event or function and removed after that event or function is over; and (c) used only in conjunction with events or functions held or exercised by the property owner, not by outside caterers or other parties.[43] Thus, notwithstanding that the Board's response to Cliff Walk's appeal spoke in terms of "sustaining" and "denying" that appeal, the Board supplied the information requested by Cliff Walk in its original letter of October 26, 2000 concerning the use of the common area and in its August 17, 2001 memorandum.
Unhappy with the illumination it received from the Board, Cliff Walk appealed the Board's response to this Court, citing G.L. §45-24-69. Cliff Walk contends that although the Board properly viewed the use of tents as lawful based on historic use, it erroneously and arbitrarily placed restrictions on such use. Cliff Walk also contends that the Board was erroneous in its belief that the hotel use exists as a legal, nonconforming use, rather than as a special use. Cliff Walk urges the Court to reverse the Board upon determining that the hotel exists pursuant to a special exception. Cliff Walk also urges the Court to reverse the Board upon determining that the Board exceeded its authority by imposing restrictions on the use of the tents. Thus, Cliff Walk seeks a disposition from this Court declaring the legal status of its property and adjudicating Cliff Walk's right to use temporary tents on a continuing basis, i.e. into the future.
Jon E. Cohen has intervened in Cliff Walk's appeal and has filed memoranda. The defendant Board rests its arguments on those of Cohen.
 Analysis
This case arises as a consequence of the Cliff Walk's obvious effort to manipulate[44] portions of G.L. § 45-24-54 and the correlative Ordinance § 17.112.010B.12 in a manner for which they are clearly not intended. Similar misuse of G.L. §45-24-54 has resulted in needless litigation before the state's zoning boards, as well as in the Superior Court. The practice at issue is the practice of property owners and attorneys to attempt to use informational requests, zoning certificates, and G.L. §45-24-54 as a vehicle to gain administrative approval for proposed development and/or changes in use or as a vehicle to enforce the zoning ordinance against a neighboring property owner.[45] To illustrate how Cliff Walk's attempted abuse of G.L. § 45-24-54 is unavailing, one must first consider the effect of a zoning certificate or response to a request for information given pursuant to G.L. § 45-24-54 and the correlative provisions of a local zoning ordinance.
General Laws § 45-24-54 authorizes the zoning officer to administer and enforce the zoning ordinance. Additionally, it states that,
 "In order to provide guidance or clarification, the zoning enforcement officer or agency shall, upon written request, issue a zoning certificate or provide information to the requesting party as to the determination by the official or agency within fifteen (15) days of the written request. In the event that no written response is provided within that time, the requesting party has the right to appeal to the zoning board of review for the determination." Id.
It is clear from the statutory language that either the zoning official or the zoning board of review, upon appeal in the event that the zoning official fails to respond to an informational request, may supply the requested information for the limited purpose of supplying guidance or clarification.[46]
One of the means by which this information can be provided is through the issuance of a zoning certificate which, by definition, is a document signed by the zoning officeracknowledging that a use, structure, building, or lot complies with or is legally nonconforming to the provisions of the zoning ordinance or is an authorized variance or special use. See G.L. § 45-24-31(65); Ordinance § 17.08.010 (defining, inter alia,
"zoning certificate"). Although a zoning certificate is issued by an official or officials of the municipality and although it may assist in clarifying questions concerning the present status of a use, structure, building or lot and whether it complies with or is legal under the ordinance, the purpose of the certificate is plainly to supply informational assistance only, and it does not operate to vest any rights in the owner of the property in question or the individual who may be making the request for the certificate. See G.L. §§ 45-24-31(65), 45-24-54,45-24-44.[47] Therefore, although a zoning certificate may well serve as an indication or statement about how the zoning official views the use, structure, building or lot insofar as it complies with the Ordinance — information that no doubt would be useful to property owners and others — it does not operate to create any enforceable rights or to divest existing rights.
Furthermore, the purpose for which a zoning certificate is given is to provide information concerning the present status
of the existing use, structure, building or lot but not proposed uses, structures, buildings or other development. Taking G.L. § 45-24-31(65) and 54 together, it is plain that the zoning official or Board has authority only to issue a zoning certificate confirming that "a use, structure, building or lot either complies with or is legally nonconforming to the provisions of the municipal zoning ordinance or is an authorized variance or modification therefrom." G.L. § 45-24-31(65). Glaringly absent from this enabling language is any reference to "proposed" uses or structures. Moreover, the operative verbs are all cast in the present tense; that is, the zoning official must determine whether the subject "complies with or is legally nonconforming" or whether it "is an authorized variance." Seeid. "It is well settled that when the language of a statute is clear and unambiguous, [a] Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." RIH Medical Foundation, Inc. v. Nolan,723 A.2d 1123, 1126 (R.I. 1999) (quoting State v. DiCicco,707 A.2d 251, 253 (R.I. 1998)). "When confronted with an unambiguous statute, we must apply the statute as written." Id. Here, it is clear from the language employed that the determination to be made under G.L. § 45-24-54 is as to an existing use or structure. Thus, neither a zoning official nor zoning board of review may issue a zoning certificate for the purpose of making a binding or enforceable determination about whether or not a proposed use, structure, building or lot would be legal under a municipal ordinance. Given the language of the pertinent sections of the Enabling Act, it is clear that the practice of attorneys and landowners to request a zoning certificate as a means of gaining binding or enforceable administrative approval is wholly unavailing and is particularly so with respect to proposed uses or development. The endless hearings and litigation that have been spawned by the misuse of zoning certificates or misunderstanding of their significance is, thus, time poorly spent.
To construe the zoning certification as binding would lead to the conclusion that a zoning board could, in the first instance, determine conclusively (subject to judicial review) the legality of an existing use. However, though the Enabling Act provides the convenience of an informational notice or advisement — whether from a zoning officer or, upon his failure, a zoning board — a zoning board is without jurisdiction to render a binding opinion as to the legality of an existing use, at least, that is, outside an appeal from an officer's determination made while enforcing
the laws. See Olean v. Zoning Bd. of Review of the Town ofLincoln, 101 R.I. 50, 52, 220 A.2d 177, 178 (R.I. 1966) (zoning board's jurisdiction is limited to "hear[ing] appeals from the determinations of administrative officers made in the enforcement of the zoning laws . . . and authoriz[ing] deviations from the comprehensive plan" by granting special exceptions and variances). Because G.L. § 45-24-54 provides for an "appeal" whereby the zoning board is authorized to issue a zoning certificate or other information — which speaks to the legality of an existing use — in the absence of an enforcement action, and, indeed, in the absence of any action of an administrative officer, to interpret the zoning certificate or other information as binding — i.e., as something other than an expedient designed to provide for the mere edification of the individual making the inquiry — would contravene the Court's holding in Olean. Seealso, RICO Corp. v. Town of Exeter, 787 A.2d 1136, 1144 (R.I. 2001) (re-affirming Olean); Franco v. Wheelock, 750 A.2d 957
(R.I. 2000) (affirming Superior Court decision that zoning board determination that certain parking restrictions applied to disputed lot was an advisory opinion — because no case or controversy existed — and stating that such "information" may be provided by board only upon zoning officer's failure to so provide within 15 days, as authorized by G.L. § 45-24-54). Rather, the appeal is more properly viewed as the Board actingqua zoning officer, to issue nonbinding advice, rather than as the delegation of jurisdiction which the Supreme Court has already determined to be absent.[48]
General Laws § 45-24-54 also authorizes a zoning official or zoning board of review to supply other information including information concerning proposed uses, but, again, only for the purpose of providing guidance or clarification. As with the case of a zoning certificate, it is clear from the plain language of G.L. §§ 45-24-44 and 54, that the zoning official or board may furnish information for this limited purpose only and thus, in supplying that information, does not affect the enforceable rights of any individual. Where the use, structure, building or other development is proposed as opposed to existing, only through the submission of proper applications for necessary permits, can a party gain an enforceable approval of proposed plans. See G.L. § 45-24-44, General Provisions — Creation ofVested Rights.
Because the express language of G.L. § 45-24-54 states that the zoning officer's determination is for "guidance and clarification," and thus non-binding, the zoning board, and this Court, may not exercise appellate jurisdiction. It is true that zoning boards of review derive their authority to hear appeals from orders, requirements, decisions, or determinations of the local official or agency from G.L. § 45-24-57(A). However, G.L. §§ 45-24-63 and 64 limit a zoning board's authority to hear appeals from a decision of the local official or agency to those appeals brought by an aggrieved party only.[49] Likewise, it is only an aggrieved party who may appeal a decision of a zoning board of review to the Superior Court and, where the individual claiming the appeal is not aggrieved of the zoning board's decision, this Court lacks the authority to hear the matter. G.L. § 45-24-69. See also Town of Coventry ZoningBd. of Review v. Omni Dev. Corp., 814 A.2d 889, 896-97 (R.I. 2003) (quoting DeCesare, 104 R.I. at 147 n. 1, 242 A.2d at 426n. 1 (Joslin, J. whom Kelleher, J. joins concurring in part and dissenting in part) (aggrievement is jurisdictional prerequisite to appeal)); 83 Am.Jur.2d Zoning and Planning, § 924 (2003) (statutes authorizing suit by person "aggrieved" are intended to broaden standing, for appeal, beyond parties of record); 59 Am.Jur.2d Parties §§ 34, 363 (2003) (standing is an aspect of subject matter jurisdiction).[50]
Thus, a zoning certificate or other information supplied in response to a request made pursuant to G.L. § 45-24-54 and the concomitant provisions of a local zoning ordinance has no binding effect, is unenforceable, is informational only, is designed to furnish guidance or clarification alone and creates no rights whatsoever. It is against that legal backdrop that the Court must consider Cliff Walk's appeal.
A. The Question of the Use of Tents on the Lawn Area Was Not Properly before the Board.
Because the Zoning Officer did not respond in 15 days to Cliff Walk's inquiry concerning the proposed development of the lawn area, Cliff Walk was entitled to appeal to the Board to obtain the information it sought. Thereafter, however, both at the hearing before the Board and in its memorandum, Cliff Walk advocated that its request to the zoning officer, regarding proposed improvements, included — "should now be read as" — a request for a determination that the use of tents on the property lawn, from time-to-time, will continue to be allowed. This twelfth hour request, however, was never submitted to the Zoning Officer and, therefore, the Board lacked the authority to respond to the request in the first instance. Parties requesting information pursuant to G.L. § 45-24-54 must squarely present their request to the zoning officer before the Board may take up the request in the absence of a response from the zoning officer. Clearly, it is the Zoning Officer who is authorized, in the first instance, to provide guidance and clarification, and the Board's authority is not triggered until he fails to so respond. See
G.L. § 45-24-54 ("[i]n the event that no written response is provided within [15 days], the requesting party has the right to appeal to the zoning board of review for the determination"). Thus the Board erred in providing the information concerning the present status of the tent use.
B. Cliff Walk Is Not Aggrieved of The Board's Response that the Hotel Is a Legal Nonconformity
Cliff Walk contends that the Board erred in finding that the hotel exists as a legal nonconformity, rather than as a special use by virtue of the Board's approval under the 1945 zoning ordinance. However, the Zoning Board made that observation in the context of supplying information concerning the use of tents in conjunction with function service on the lawn area, as Cliff Walk had requested. In fact, in that request, Cliff Walk argued that the lawn use enjoyed rights pursuant to those sections of the Ordinance and the Enabling Act dealing with nonconforming developments. Thus, because the Board's was the very statement that Cliff Walk was seeking, it cannot be aggrieved by it. And although Cliff Walk contends that the Board improperly restricted the lawn use, it is clear that those "provisions" constituted nothing more than the Board's observations concerning the extent to which the Board viewed the use of those structures to belegally nonconforming, albeit haphazardly cast in terms of enforceable restrictions.
Finally — and even assuming that the lawfulness of using the lawn for functions, replete with tents, was properly addressed to, and by, the Board — as discussed above, only an aggrieved party may appeal a decision to the Superior Court and, where the individual claiming the appeal is not aggrieved of the zoning board's decision, this Court lacks the authority to hear the matter. "Aggrievement in the personal sense requires an actual and practical, as distinguished from a mere theoretical, interest in the controversy, and it results when the judgment whose review is sought adversely affects in a substantial manner a personal or property right of the applicant or imposes upon him some burden or obligation." Hassell v. Zoning Bd. Of Review 108 R.I. 349, 351, 275 A.2d 646, 648 (1971) (quotations omitted) (cited inEast Providence v. Shell Oil Co., 110 R.I. 138, 142-43,290 A.2d 915, 917-18 (1971)). Nonbinding determinations have no actual and practical effect on a party's rights and impose no burdens. Rather, the purpose to the information provided in such determinations is to provide guidance as to what one's rightsmight ultimately be found to be should an actual controversy arise. Because the zoning official or board's action in issuing a certificate or providing information creates no vested rights under G.L. § 45-24-44, and is a non-binding and unenforceable determination creating no true controversy, there will usually[51] be no party who is aggrieved.
Here, because the information supplied by the Board in response to Cliff Walk's G.L. § 45-24-54 request for a zoning certificate or other information is non-binding and unenforceable, the Cliff Walk's challenge could only come, if necessary, following a proper and formal application for a building permit or for relief under the zoning ordinance. Only then may the grant or denial of enforceable rights be triggered. See, infra., Part C. Thus, Cliff Walk has not alleged, nor does the Court perceive, that this is a rare case where a mistake in a zoning certificate or other written informational response substantially affects the applicant's personal or property rights such that the person can be said to be aggrieved of the mistake. For these reasons, the Cliff Walk's appeal should be denied and dismissed.
C. Cliff Walk Is Not Aggrieved of the Board's Response Concerning Proposed Improvements to the Lawn Area
Cliff Walk also cannot be aggrieved by the Board's findings relating to proposed improvements to the lawn area including the patio, food service station, and future swimming pool.[52]
In the case of proposed development, it is only upon submission of a "substantially complete" application, in proper form, to the appropriate official or agency that a grant or denial of enforceable rights is at stake, and a substantial interest will arise accordingly. G.L. § 45-24-44. See also Ordinance § 17.04.040. Thereafter, a grant or denial of the application would be an appropriate subject of review. Prior to a formal application, however, any information provided under G.L. §45-24-54 is simply a non-binding and unenforceable determination. Thus, Cliff Walk is not bound by the decision, and no personal or property interest has been substantially affected by the determination. For this reason, too, the Cliff Walk's appeal should be denied and dismissed.
This Court's conclusion — that review is unavailable for determinations as to proposed plans made pursuant to a request that falls short of a substantially complete application for a building permit or for other relief allowed pursuant to the provisions of a local zoning ordinance — is confirmed by policy considerations, in light of settled principles of statutory construction. "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Webster v. Perotta, 774 A.2d 68, 75 (R.I. 2001) (citing Matter of Falstaff Brewing Corp. Re:Narragansett Brewery Fire, 637 A.2d 1047, 1050 (R.I. 1994)). "Moreover, when confronted with an unclear or ambiguous statute, there is room for statutory construction and we examine the statute in its entirety in order to `glean the intent and purpose of the Legislature.'" Id. (quoting In re Advisory to theGovernor, 668 A.2d 1246, 1248 (R.I. 1996). In doing so, "this Court `will not construe a statute to reach an absurd [or unintended] result.'" Hargreaves v. Jack, 750 A.2d 430, 435 (R.I. 2000) (quoting Kaya v. Partington, 681 A.2d 256, 261 (R.I. 1996)). Here, the framers of the Enabling Act contemplated, in G.L. § 45-24-44, that formal procedures would be established whereby, upon submission of a "substantially complete" application for development "submitted for approval to the appropriate review agency in the city or town," a party proposing development would gain vested rights to have the conformity of that development judged by existing ordinances. It would be an absurd construction to find, within the Enabling Statute, an alternative procedure whereby a party could gain the same rights by means of an informational request propounded to a zoning officer. Thus, any such alternative procedure could vest no rights, and a party wishing to act upon information obtained thereby would still be required to get binding approval through a formal application process. Clearly, the legislature did not intend the waste of resources that would result from redundant administrative or judicial review processes, as would be the case if review were available for the first, nonbinding decision.
Moreover, the availability of administrative or judicial review absent a formal application would encourage premature litigation — as this justice has observed to be occurring often.[53]
The requirement of a "substantially complete" application for a building permit or relief allowed pursuant to the provisions of a local zoning ordinance assures a sincere intent to develop, and thus a real case or controversy, and, in particular, discourages judicial involvement in local zoning matters when this involvement might ultimately become unnecessary as a result of an applicant's changed plans. See Pepperman v. Town of Rangeley,659 A.2d 280 (Me. 1995) (where ordinance did not provide for appeal to the zoning board of an officer's violation determination, the board's unauthorized review of such determination was advisory in nature and not subject to judicial review).
 Conclusion
For the foregoing reasons, this Court concludes that Cliff Walk's request as to the lawfulness of the future use of the lawn and tents was not presented to the Zoning Official and therefore was not properly before the zoning board as an appeal. Therefore, the Board should not have endeavored to provide the information requested, rendering its so-denominated decision a nullity in that respect. Furthermore, because Cliff Walk is not aggrieved as to any of the information supplied by the official or Board, it lacks standing to appeal to this Court.[54] Cliff Walk's attempt to utilize G.L. § 45-24-54 as a vehicle to gain binding administrative approval of its proposed development plans or to obtain a declaration concerning the legal status of its property is unauthorized and unavailing. Accordingly, its appeal must be denied and dismissed.
[1] Cliff Walk takes a different position in the companion case. See infra, "Part II-Inn at Cliff Walk, Inc."
[2] All references to transcripts in Part I of this decision refer to those contained in the record in the matter of Jon. E.Cohen v. Duncan, et al., C.A. No. NC2002-599.
[3] Historic District Commission approval of exterior changes to the property was a precondition to the issuance of a building permit for such changes. Ordinance § 17.80.040.D(1)(c).
[4] All references to Respondent's ("Res.") or Appellant's ("App.") exhibits ("Ex."), in Part I of this decision, refer to the record in the matter of Jon. E. Cohen v. Duncan, et al.,
C.A. No. NC2002-599.
[5] Portions of actual construction, prior to completion, are depicted in App. Ex. 11 A B and 12 A B.
[6] The record of this case does not contain any plans so identified.
[7] Pursuant to Ordinance § 17.88.020.A., development plan review is required for certain specified uses, including for transient guest facilities. (A hotel is a transient guest facility. See Ordinance § 17.08.010). According to the Ordinance, development plan review is a prerequisite to issuance of a building permit. Id. § 17.88.070.
[8] In addition to the September 1, 2000 building permit, Cliff Walk applied for and received separate permits for the new electrical, plumbing, HVAC, gas piping for the fireplaces, and sprinkler systems, as well as a permit for voicemail and data port systems. The number of construction permits for which Cliff Walk applied totaled 7 — not counting the half dozen unrelated building permits it took out to erect tents and conduct clam boils, etc. The total estimated construction costs for the permitted improvements, as set out in Cliff Walk's permit applications, was $717,000.00. (App. Ex. 9).
[9] Given an attorney's representative capacity, the author of the letters hereafter is referred to merely as "Cliff Walk."
[10] Only two of the letters are pertinent to the issues raised in this appeal. The third letter is a part of the record in the companion case, Inn at Cliff Walk, Inc. In that letter, Cliff Walk sought approval for changes to the property, including the addition of a permanent patio, an outdoor food staging area and bathroom facilities, and a swimming pool. See infra, "Part II-Inn at Cliff Walk, Inc."
[11] See infra, "Part II — Inn at Cliff Walk, Inc."
[12] Some of the exhibits introduced during the hearing before the Board were not marked, although they were transmitted to the Superior Court as part of the record. The parties disagree that the plan referred to by the Court as Res. Ex. 19B is accurately identified. However, a review of the transcript makes it clear enough that this plan, bearing a revision date of 1/20/01 and showing a reduction in staircases for the east wing balcony system from 4 staircases to 3, was part of Res. Ex. 19.
[13] It was just four days later that the Board began hearings on Cliff Walk's separate bid to establish the hotel's status as that of a special exception or conditionally permitted use and to have certain uses of its lawn area approved. During those hearings, Cohen unsuccessfully attempted to focus the Board's attention on the full nature and extent of Cliff Walk's development project. See infra, "Part II — Inn at Cliff Walk, Inc."
[14] This plan was not transmitted to this Court as part of the record before the Board.
[15] The transcript of the January 31, 2002 hearing mistakenly reflects a date of January 31, 2001.
[16] Given that the attorney wrote to the Zoning Officer on October 26, 2000, Shufelt's knowledge of the hotel's status clearly predated that event.
[17] At the outset of the hearing, Cohen agreed that he had no objection to the interior changes to the property as had been shown on the plans submitted with the application for the September 1, 2000 building permit. (Tr. at 94 (Jan. 31, 2002)). Cohen did, however, press his appeal to the approval of the May 22, 2001 Development Site Plan as well as to any "other approvals permitting any expansions of or changes to the property. . . ."
[18] The parties have not discussed whether that decision, i.e. Decision of Newport Zoning Bd., In Re: Appeal of Nicholas, Inc,
(1999), was properly issued. It appears, however, that it may have been an improper review of a nonbinding, unenforceable determination made pursuant G.L. § 45-24-54. See Tr. at 50 (Oct. 22, 2001) (testimony of Turner Scott before Board, explaining that "[w]hat happened in the area was Mr. Weston indicated to us that we couldn't use that area as a commercial parking lot and I appealed that ruling to the board"); seealso Weston testimony, Tr. at 264 (Jan. 31, 2002). Absent a cease and desist order or enforcement action triggering a genuine controversy, the only method by which the zoning officer could have commented upon the use of the parking lot was via a §45-24-54 request for zoning certificate or other information. Thus, the Board's decision in that matter may have been a declaration of rights in contravention of the Supreme Court holding in RICO Corp. v. Town of Exeter, 787 A.2d 1136 (R.I. 2002). See also Taylor v. Marshall, 119 R.I. 171,376 A.2d 712 (1977); Franco v. Wheelock, 750 A.2d 957 (R.I. 2000). Seealso, infra "Part II-Inn at Cliff Walk."
[19] This Court notes, without deciding the matter, that the Ordinance provisions relating to development plan review appear to require the issuance of a building permit for alterations ofany building or structure where the use is specified as one for which development plan review is required.
[20] See, infra., n. 31.
[21] Rhode Island General Law section 45-24-64 provides that an appeal to the zoning board be taken within a "reasonable time."Ordinance § 17.116.010 provides a ten day limitation.
[22] See infra, "Part II — Inn at Cliffwalk, Inc."
[23] See Koolian v. Town Council of Bristol, 572 A.2d 273
(R.I. 1990) (permit issued before required CRMC approval was ineffective).
[24] A development is not lawfully established, e.g., if the use is prohibited in the relevant district, under the ordinance then in effect, or if the use or development violates a specific zoning restriction without proper relief as authorized by the ordinance in effect at the time the development is established.See generally, 4 Rathkopf, The Law of Zoning and Planning,
§§ 72:12-72:18.
[25] Black's Law Dictionary defines "alteration" as "[v]ariation; changing; making different. A change of a thing from one form or state to another; making a thing different from what it was without destroying its identity." Black's LawDictionary with Pronunciations, 77 (6th ed. 1990). Similarly, the American Heritage Dictionary (4th ed. 2000), which defines an alteration as "the condition resulting from altering," defines the term "alter" as merely "[t]o change or make different; modify." Id. at 53.
[26] Notably, in authorizing municipalities to permit alterations to nonconforming developments, the Enabling Act includes all nonconformities within the term "nonconforming development," and makes no distinction between use and structure (i.e., dimensional nonconformity). See G.L. § 45-24-31(49) (defining "nonconformance" as any "building, structure, or parcel of land, or use thereof, lawfully existing at the time of the adoption or amendment of a zoning ordinance and not inconformity with the provisions of that ordinance") (emphasis added).
[27] It is fitting that a special use permit be required for alterations to nonconforming uses, even if the alterations conform to the Ordinance's dimensional requirements. Alterations (as opposed to ordinary maintenance or restoration of unsafe structures), have the potential to prolong the nonconformity to the detriment of the public policy goal of its eventual elimination. See RICO, 787 A.2d at 1145. The special permit system establishes the criteria for allowable alterations and assures that they are consistent with the town's comprehensive plan, see G.L. § 45-24-42, which may or not adopt the common law's disdain for nonconformities.
[28] The distinction in G.L. § 45-24-40(c) between nonconforming uses created by special use permit or variance and those created by right is a logical one for the purposes of the section. Otherwise, if an ordinance change rendered their property nonconforming, owners of a use that was originally permitted by right in the district would find themselves subject to greater loss of rights than owners whose uses had been established by special exception or variance. Thus, even if Newport had accepted the State's invitation to allow alteration of nonconforming development, it could not have extended such permission to Cliffwalk inasmuch as the hotel was originally established pursuant to what is now a special use permit.
[29] Sections 17.72.030B and C provide that:
 "B. No nonconforming use of land shall be moved to another part of a lot or outside the lot, and no nonconforming use of a building shall be moved or extended to any other part of the building not expressly arranged and designed for such use at the time the use became nonconforming, and no building containing a nonconforming use shall be moved, unless the result of such move is to end the nonconformity. No nonconforming building shall be moved, unless the result of such moving is to reduce or eliminate its nonconformity.
 C. No nonconforming use of land, nonconforming use of a structure, or nonconforming structure shall be changed except to a conforming use or structure. No nonconforming structure, if once changed to conform, shall thereafter be changed so as to be nonconforming again."
(Likewise, Section 17-72-010 treats unimproved sub-standard lots under single ownership as merged, evidencing the intent that nonconformities be eliminated).
[30] In anticipation of what is to follow, Ordinance § 17.72.030A, warns that "[n]othing in this zoning code shall be deemed to prevent the strengthening or restoring to a safe condition of any structure or part thereof declared to be unsafe by decree of any official charged with protecting the public safety. . . . Nothing in this Code shall be deemed to prohibit ordinary repair and maintenance of a nonconforming structure or replacement of existing materials. . . ." Thus, while the Ordinance prevents nonconformities from being given new life, it does allow them to be kept safe and in a condition of good repair until such time as they become obsolete.
[31] Because a zoning board may grant a dimensional variance only in conjunction with uses permitted by right, Newton v.Zoning Bd. of Review of the City of Warwick, 713 A.2d 239 (R.I. 1998), and special uses when "provided for in the special use permit sections of the zoning ordinance," G.L § 45-24-41(d) (P.L. 2002, ch. 218, § 1), it would be unavailing for Cohen to apply for a dimensional variance here. Thus, given the Ordinance's provisions pertaining to non-conformities and the proof required to obtain a use variance, Cliff Walk's motivation for splintering the administrative process seems evident.
[32] Rhode Island General Laws § 45-24-49 authorizes DPR in only two situations. The first situation — plainly inapplicable here — involves an application made for uses requiring a special-use permit or variance, for zoning ordinance amendments, or for zoning map changes. G.L. § 45-24-49(a). In these instances, the review must be conducted by the planning board or commission and is only advisory to the permitting authority.Id. The second instance in which development plan review may be conducted — also inapplicable here — is for uses permitted "by right under the zoning ordinance. . . ." G.L. § 45-24-49(b). (DPR pursuant to subsection 45-24-49(b) and any concomitant sections of the Ordinance are inapplicable for the reason that the hotel is a non-conformity, and not permitted in the zoning district by right. A permitted use is "a use by right which isspecifically authorized in a particular zoning district." G.L. § 45-24-31(52) (emphasis added). See also Newton v.Zoning Bd. of Review of the City of Warwick, 713 A.2d 239 (R.I. 1998) (variance could not be granted in conjunction with special use permit because the former was available only for "legally permitted" uses). Therefore, the hotel is not a use permitted by right in the R-20 district. See Ordinance § 17.28.020A. (listing "uses [that] are permitted by right" in R-20 district)). Accordingly — because Cliff Walk did not apply for a variance and because the review was not conducted by the planning board — the Zoning Officer must have been intending to exercise powers underOrdinance § 17.88.010, which contains Newport's own brand of development plan review.
[33] Though the parties do not challenge and thus this Court will not examine the provisions here, the Court is mindful that an ordinance probably may not provide development plan review beyond that expressly authorized by G.L. § 45-24-49 of the enabling statute. That section appears to be a permissivedelegation of authority. See id. ("a zoning ordinance may
provide for development plan review . . ." (emphasis added), and establishing requirements as to such DPR). The inclusion of this power implies that no others may be exercised — inclusio uniusest exclusio alterius. And "a municipal ordinance is preempted if it conflicts with a state statute on the same subject." Townof Warren v. Sandra Thornton-Whitehouse, 740 A.2d 1255, 1261 (R.I. 1999) (citing State v. Pascale, 86 R.I. 182, 186-87,134 A.2d 149, 152 (1957)). To the extent that DPR is authorized for uses requiring a variance, as is the case here, the Enabling Act requires that the planning board or commission be the reviewing authority, and denominates the review as advisory only.
[34] The Board's conclusion appears to rest on a philosophy that a hotel-is-a-hotel-is-a-hotel, thus ignoring that even where physical extensions or alterations are permitted, the alterations may be so drastic as to constitute an impermissible change in the use. The question is one of degree, and in conducting the analysis, zoning boards ought to bear in mind that "[t]he alteration or substantial remodeling of a building existing as a nonconforming use is logically inconsistent with the principle that an essential purpose of zoning regulations is the stabilization of property uses; fundamental structural improvements will serve only to perpetuate the nonconforming use." Hyatt v. Zoning Bd. of Appeals, 163 Conn. 379, 384,311 A.2d 77, 80 (1972) (internal quotes omitted); see also 101A C.J.S. Zoning Land Planning §§ 64, 171. "If there has been a `change of use,' the general rule is that the previous use has been abandoned and cannot be resumed." 4 Rathkopf, supra., § 73:14; Harmel Corp. v. Members of Zoning Bd. of Review,603 A.2d 303, 306 (R.I. 1992). "A change of use results when the proposed use is "substantially different from the nonconforming use to which the premises were previously put." Jones v.Rommell, 521 A.2d 543, 545 (R.I. 1981). The distinction between enlargements or extensions of use and changes is one of degree. Thus, for example, in Santoro v. Zoning Bd. of Review, supra.
n. 33, our Supreme Court upheld a finding of a change in use where an existing, wooden gasoline and grocery store hybrid was replaced with a new concrete structure and three or four pumps instead of two, "all of which would mean additional business and increased traffic and noise." Id. at 72, 171 A.2d 77. Such a change of use requires compliance with current ordinances.Harmel Corp., 603 A.2d at 306. The evidence in this case is that Shufelt has proceeded well into his plans of converting the previously modest hotel, perhaps on its way to extinction, into the planned state-of-the-art luxury resort. Thus, it is likely that Cliff Walk's grandfather rights have terminated, and its legal status has changed from lawfully non-conforming development to illegal, non-conforming development.
[35] The court does not decide here whether an application mayexpressly incorporate by reference all work shown on the plans. Such express reference, however, was not made in Cliff Walk's application. Even assuming, however, that the application did incorporate the plans by reference, the permit issued by the Building Official did not extend, on its face, to the entire plans. Furthermore, Cliff Walk does not contend, and could not correctly or credibly contend, that any time a building permit is issued it must necessarily extend to every proposal suggested in the drawn plans. Rather, Cliff Walk's argument was that the words, "per plan," indicate full approval of the drawings. This torturous reading, however, violates common sense and the English language.
[36] See, supra., Part D. (under terms of the Ordinance, alteration of nonconforming development requires a variance).
[37] Rhode Island General Laws § 45-24-39 permits local ordinances to make provision for "nonconforming developments" and, in keeping with that section, Ordinance § 17-72-020 contains language regulating nonconforming development. Seesupra, Part I — The Cohen Appeal. Plaintiff's conclusion appears to have rested, at least in part, on advice received in a 1993 letter from then City Solicitor Newport, Joseph Nicholson, Jr. That letter was the culmination of a minor dispute between the former owners of the property and a complaining neighbor regarding the service of alcohol on the property lawn. In the letter, Mr. Nicholson stated that such service was permissible. Mr. Nicholson also informed the owners that "[r]egarding the tent situation, Guy Weston indicates that the Cliff Walk Manor has had tent permits in the past and there would appear to be no obstacles for the future." Letter from Joseph Nicholson, Jr.City Solicitor, City of Newport to Christopher S. Gontarz, Esq.
(Apr. 20, 1993).
[38] As was revealed by the Zoning Officer's remarks made in a subsequent hearing before the Zoning Board of Review, the Zoning Officer did not believe he had sufficient information to respond to the Plaintiff's letter request concerning the proposed development of the common areas. Record, In Re: The Appeal, TheInn at Cliff Walk, (Tr. at 4 (May 29, 2001)).
[39] Cliff Walk claimed a separate "appeal" with respect to the October 31, 2000 zoning certificate in which the Zoning Officer stated that the proposed refrigeration unit was "strictly forbidden." Ultimately, Cliff Walk dropped that "appeal" in the face of neighborhood opposition and, instead, constructed one of the courtyard systems at issue in "Part I — The Cohen Appeal" in the vicinity proposed for the refrigeration unit.
[40] All references to transcripts in Part II of this decision refer to those contained in the record in the matter of Inn atCliff Walk, Inc. v. Zoning Bd. of Review of the City of Newport
C.A. No.NC2001-380.
[41] It is this memorandum that clearly betrays Plaintiff's intentions concerning the administrative effect of these serialized zoning certificates. In the memorandum, Plaintiff referred to its requests for the zoning certificates as requests for "rulings" from the Zoning Official, pointed to G.L. §45-24-54 and Ordinance § 17.112.010B.12, and stated that it "merely wants to retain and confirm the historical rights of use on the property." Appellant's Memo to Board at 2. And, as indicated, the plaintiff asserted in that memorandum, "The letters to Mr. Weston dated October 26, 2000 and November 22, 2000 while originally dealing with the hotel's right to make certain improvements. . . ." Id. (emphasis added).
[42] It was in this context that the Board came to the conclusion that the use of the hotel in a residential zoning district is a non-conforming use.
[43] It is clear enough from the record that the Board was attempting to memorialize what it understood to be the historical use of the tents so that its comments concerning future use of the tents could not be misconstrued.
[44] As the record reveals, Plaintiff's multiple attempts to obtain zoning certificates were part of a larger scheme obviously designed to fragment Plaintiff's overall development plan by parsing it into isolated components for "approval," thereby circumventing the formal application process required for all prospective development plans, in particular, development plans respecting non-conformities. See supra, "Part I — The Cohen Appeal." In addition to the letters referenced in the instant case, the record in Cohen also disgorged what appears to be yetanother request (1999) for a zoning certificate and ensuing appeal to the zoning board having to do with the status of lawn area as a commercial parking lot operated on the premises, indicating that Cliff Walk or its attorneys were no stranger to the practice of using a G.L. § 45-24-54 as a vehicle to gain administrative approval for proposed development and/or changes in use).
[45] Cf. Roland F. Chase, R.I. Zoning Handbook, § 101 (2000) (positing an interpretation of zoning certificate provision that the legislature intended to enable ordinary citizens to initiate zoning enforcement actions).
[46] In addition to expressly stating that the officer's zoning certification or informational determination is to be for "guidance and clarification," the Legislature clearly distinguished the nature of this additional duty from the acts of "administration and enforcement," which describes those core functions of the zoning officer expressly enumerated in the preceding list. See G.L. § 45-24-54(1)-(8). "Administration and enforcement" includes management and imposition of the zoning ordinance; together, the penumbra of these terms include every act that could be binding. With respect to said list, a principle of statutory construction is that "the expression of one or more items of a class and the exclusion of other items of the same class imply the legislative intent to exclude those items not so included." 2a Sutherland Stat. Const. § 47:23 (6th Ed.), 313 n. 7 (citing Southwestern Iron Steel Industries, Inc. v. State,123 Ariz. 78, 597, P.2d 981 (1979)). While the list may not be exclusive, the Legislature clearly contemplated the zoning certification procedure and intentionally excluded it from the list. And while the list itself references the issuance of "certificates," and also includes acts that are not binding — the inspection of suspected violations, for example, clearly has no binding effect if no further action is taken — the important observation is that, had the Legislature intended the certificate to be binding, it would not have written a distinct provision for it, intentionally and expressly iterating the officer's advisory role. Thus, though the Legislature included the act of issuing "certificates" in the list, it also contemplated at least one specific type — the zoning certificate — making clear that that certificate is for "guidance and clarification" only. (It is also important to note that the certificates that the officer is charged with issuing, in the list, are "required certificates." (Emphasis added). The zoning certificate, however, is not required, but provided as a convenience to requesting parties. Thus, it is not within the scope of this other "certificate" provision of G.L. § 45-24-54)).
[47] That a zoning certificate is defined as anacknowledgement of status, and not as a decision provides further plainlanguage support for the conclusion that a zoning certificate is merely a means of providing information. See
G.L. § 45-24-31(65). Thus, it is clear that a zoning certificate merely acknowledges the building official's belief or opinion concerning the property's current standing. If, on the other hand, a building official's opinion dispensed in the form of a zoning certificate was meant to be binding, it would empower the official to declare, create or change rights and would lead to absurd results. For example, if a landowner requested a certificate stating that her use was permitted of right, but received a certificate wrongly acknowledging, instead, its legal nonconformance, the landowner would have to appeal — even if she would prefer to abandon any development plans — or risk being estopped from later challenging that determination. However, the Legislature clearly did not intend the zoning certification to have such an effect. Therefore, the zoning certificate cannot be interpreted as binding. Furthermore, because the definition of a zoning certificate anticipates that such a certificate will affirmatively acknowledge the current status of the property, in those instances where the Officer determines that a use, structure, building, or lot does not comply with the ordinance,is not legally conforming, and is not an authorized variance, the appropriate response is not a zoning certificate, but merely "information as to the determination" and therefore not binding. G.L. § 45-24-31 (65) 54.
[48] At this point, it is worth mentioning G.L. § 45-24-66, which provides that the "zoning board of review shall fix a reasonable time for the hearing of the appeal, give public notice, as well as notice to the parties of interest, anddecide the matter within a reasonable time." (Emphasis added). This section refers to "the appeal." Given the order of the Enabling Act's provisions, "the appeal" referred to is that provided for in G.L. §§ 45-24-63 and 64. Because these provisions contemplate prior decisions of the zoning officer, whereas G.L. §45-24-54 refers to an initial determination by the board, the latter "appeal to the zoning board of review for the [zoning certification]" is conceptually different. (This distinction is highlighted by the fact that §§ 45-24-63 and 64 refer to appeals to the decisions of an officer by aggrieved parties. Section45-24-54, however, refers to a determination and an applicant who has not received any response, whether deemed a decision or determination). Thus, the extensive formalities required by G.L. § 45-24-66 and, also, G.L. § 45-24-61 (regarding decisions of the Board), are probably not applicable in the context of the zoning certification.
[49] Because appeals by aggrieved parties come within the ambit of G.L. § 45-24-57(A)(1), interpreting that section to require
Board review of appeals by non-aggrieved parties would render §§ 63 and 64 redundant, or mere surplusage. This would violate the "canon of statutory interpretation which gives effect to all of a statute's provisions, with no sentence, clause or word construed as unmeaning or surplusage." Local 400, International Federationof Technical and Professional Engineers v. Rhode Island StateLabor Relations Board, 747 A.2d 1002, 1007 (R.I. 2000) (quotingRhode Island Department of Mental Health, Retardation, andHospitals v. R.B., 549 A.2d 1028, 1030 (R.I. 1988)). Therefore, §§ 63 and 64 are properly interpreted as limiting the proper exercise of the zoning board's general authority under §45-24-57. And because those sections define who may appeal, they provide a standing/jurisdictional limitation. See infra.
Also, if the zoning board were required to entertain appeals from nonaggrieved parties there would be no limitation — would only parties to a non-binding decision be included, or could an individual with no discernible interest at all appeal an officer's determination (whether binding or not)? The result of such a rule would overburden the zoning boards — as has already so often proved true given the existing practices surrounding requests for information and zoning certificates. The Legislature could not have intended this.
[50] Although the conclusion that there is no appeal to a G.L. § 45-24-45 certification, or other provision of information, follows from the non-binding nature of the zoning officer's response, the lack of notice provisions in the Enabling Act also provides additional support for the reverse conclusion — i.e., that the determination is nonbinding. That is, if a zoning certificate were intended to be binding, one would expect a provision requiring that notice be given to neighbors, for example, in the event that a zoning certificate is provided. Given the absence of such mandatory notice, the time in which a zoning certificate could be appealed could be indefinite.Zeilstra v. Barrington Zoning Bd. of Review, 417 A.2d 303 (R.I. 1980) (time limitations for appeals do not begin to run until complainant is charged with knowledge of decision appealed to);See Almeida v. Zoning Board of Review of Tiverton,606 A.2d 1318, 1321 (R.I. 1992) (plaintiffs not entitled to rely on permit to build basement apartment where district was zoned only for single-family use) (town is not estopped by officer's improper or erroneous acts). This result is in contrast to the issuance of a building permit, for example, which contemplates immediate action which would put an abutting land owner on notice to search the public record. Such a possibly indefinite appeals time could not have been the intent of the Legislature. Thus, the conclusion that a zoning certification is unappealable is a logical construction which, in turn, supports the conclusion that the certificate is nonbinding.
[51] It is conceivable that there may be situations in which an individual could be aggrieved of even a non-binding, informational determination made by a local zoning official. An example might be a situation in which a property owner requires a zoning certificate indicating the current status of the property for the purpose of, say, obtaining a mortgage or marketing the property. Were the zoning official to issue a zoning certificate containing incorrect information which, in turn, prevented the property owner from being able to obtain a mortgage or to sell the property, the property owner may well be aggrieved of that determination for purposes of an appeal notwithstanding the non-binding nature of the certificate. Without deciding the matter, it is this Court's observation that such an appeal should serve only to correct the non-binding information provided — as opposed to creating legal rights.
[52] It is noted that this informational request improperly sought a zoning certificate, which may be issued only as to existing uses and structures. Nonetheless, the request could have been properly entertained under G.L. § 45-24-54, although the answer could not be deemed a zoning certificate.
[53] It has not been lost on this justice that some property owners and attorneys attempt to use G.L. § 45-24-54 as a tool toprecipitate premature review and litigation so that they can avoid disclosure of their true plans and intentions. For example, in Gateway Healthcare, Inc. v. Zoning Bd. of Review, No. 01-0809, R.I. Super. LEXIS 74 (Jun. 18, 2002), the plaintiff's strategy was to base a request for a zoning certificate upon generalized concepts and limited factual information about its proposed plans for development. After receiving the zoning certificate, it planned to file for a final building permit and, if the Town refused to issue the permit, to proceed to the Superior Court for a Writ of Mandamus compelling the issuance of the permit — on the grounds that it had obtained administrative approval via a zoning certificate.
[54] Although the issue of standing has not been raised, "this question [is] of such overriding importance as to be raised suasponte." Town of Coventry Zoning Bd. of Review v. Omni Dev.Corp., 814 A.2d 889, 896-97 (R.I. 2003) (quoting DeCesare v.Board of Elections, 104 R.I. 136, 141, 242 A.2d 421, 423-24 (1968) (holding that even though parties had not orally argued or briefed the issue of standing, the Supreme Court could raise the issue sua sponte, and concluding that members of a local board of canvassers were not aggrieved parties, and thus lacked standing to seek or obtain judicial relief in an elections dispute)).